Frederick R. Thaler (7002)
David B. Dibble (10222)
Katherine E. Priest (14758)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: rthaler@rqn.com
         ddibble@rqn.com
         kpriest@rqn.com

*Attorneys for Defendant Delta Air Lines, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLAIR LAMPE, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>DELTA AIR LINES, INC., a foreign corporation,<br><br>        Defendant. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>Case No.: 2:22-cv-00055-TC<br><br>District Judge Tena Campbell |

# TABLE OF CONTENTS

INTRODUCTION AND RELIEF SOUGHT ................................................................. 3

BACKGROUND FACTS ........................................................................................... 5

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................... 8

ARGUMENT ............................................................................................................ 20

I.     SUMMARY JUDGMENT STANDARD ....................................................... 20

II.    PLAINTIFF'S CLAIMS ARE TIME-BARRED AS A MATTER OF LAW. ................. 21

    A.     Plaintiff's Title VII Claims Based on the Allegations in the Second Charge are Time-Barred as She Failed to File Suit Within 90 Days of Receiving the NRTS from the EEOC. .................................................................. 21

    B.     Plaintiff's Claims Arising Prior to November 21, 2020 Are Untimely as a Matter of Law. .......................................................................................... 23

III.   EVEN IF THEY WERE NOT TIME BARRED, PLAINTIFF'S TITLE VII CLAIMS FAIL AS A MATTER OF LAW ....................................................... 25

    A.     Discrimination Claim Generally. .............................................................. 25

    B.     Plaintiff's Title VII Claim for Unequal Pay Fails as a Matter of Law. ................. 25

    C.     Even if Plaintiff's Title VII Claims Were Not Time-Barred, Her Failure to Promote Claims Also Substantively Fail as a Matter of Law. .............................. 27

        i.     Plaintiff Cannot Establish a Prima Facie Case on her Time-Barred Title VII Claims, including her Failure to Promote Claims ..................... 27

        ii.    Delta's Decisions for Each Position at Issue Were Legitimate and Nondiscriminatory. ...................................................................... 31

        iii.   No Evidence of Pretext Exists with Respect to Delta's Hiring Decisions. .................................................................................... 31

IV.    PLAINTIFF'S EQUAL PAY CLAIMS FAIL AS A MATTER OF LAW ..................... 32

CONCLUSION ........................................................................................................ 33

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and DUCivR 7-1 and 56-1, Delta Air Lines, Inc. ("Delta"), by and through undersigned counsel of record, hereby moves for summary judgment on all claims for relief asserted by Plaintiff Blair Lampe ("Plaintiff") in the Complaint filed on January 11, 2022 ("Complaint").

## INTRODUCTION AND RELIEF SOUGHT

All of Plaintiff's claims fail as a matter of law and should be dismissed.  In addition to being time barred, Plaintiff's claims under Title VII fail because she was never denied any promotion for which she was the most qualified candidate.  Similarly, her discriminatory pay claims under both Title VII and the Equal Pay Act fail for the simple reason that Plaintiff was not paid less than any male employees in the same position.

Notwithstanding that she remains employed by Delta and has received various promotions, with a salary that is more than double what she earned in her previous positions in Salt Lake City, Plaintiff has continued to file a series of charges and complaints that are both legally and factually unsupported.  While many of her claims against Delta were summarily dismissed in a previous lawsuit before Judge Stewart of this Court, Plaintiff nevertheless continues to pursue meritless claims.

To begin, her claims under Title VII are time barred.  To avoid dismissal of her untimely claims, Plaintiff's complaint alleged facts that are patently false.[1]  For purposes of this case, she filed two separate charges of discrimination, containing different allegations of purported

---

[1] Sadly, as discussed in more detail below, the EEOC's file contains correspondence that shows that Plaintiff pled false facts in her Complaint in an apparent attempt to avoid a motion to dismiss for untimeliness.

discrimination.[2]  But as the record evidence demonstrates, Plaintiff failed to file her Complaint within 90 days of receiving a notice-of-right to sue from EEOC for the first charge (a statutory requirement), and that charge forms the basis for this case.  Although Plaintiff received that notice over one month before she received a separate notice for her second charge, in her Complaint she falsely alleged that she received both notices at the same time – thus giving the false impression that her Complaint was timely with respect to both charges.  It is apparent, however, that her first charge is time barred and her Title VII claims, which were contained in the first charge, should be dismissed as untimely.

Even if her Title VII claims were not time barred, Plaintiff's sworn deposition testimony makes clear that she continues to pursue legally invalid claims based on her unsupported assumption that she was the most qualified candidate for every position she applied for, and her knee-jerk claim that her non-selection for certain promotions (for which she was not qualified) must have been discriminatory.  The record evidence, however, demonstrates that Delta selected candidates who were objectively more qualified, and Plaintiff now finally concedes under oath in her deposition that she did not possess the same qualifications as those candidates.  Thus, her claims for failure to promote fail on their merits.

Finally, Plaintiff's claims of unequal pay under both Title VII and the Equal Pay Act fail because Delta did not pay male employees – in the same position and who possessed the same qualifications and seniority – more than Plaintiff.  To the contrary, pay at Delta for Plaintiff's GMM position is determined by a set, non-discretionary pay scale, and she was the highest paid employee in her position.

---

[2] Plaintiff filed another, earlier charge against Delta in the previous case that was dismissed.

For these reasons, Delta requests that the Court enter summary judgment in its favor on all of Plaintiff's claims.

Pursuant to DUCivR 7-1(f), Delta requests a hearing on this motion.

## BACKGROUND FACTS

Founded in 1924, and headquartered in Atlanta, Georgia, Delta is one of the world's largest global airlines. Delta has nearly 90,000 employees worldwide and flies to hundreds of locations in over 60 countries.

Delta is firmly committed to a policy of equal employment opportunity, non-discrimination, and non-retaliation. (*See* The Way We Fly and Code of Ethics and Business Conduct manuals, attached as Exhibit 1 to the Appendix[3]; *see also* Deposition of Blair Lampe ("Lampe Depo."), 55:14-57:18, 62:22-67:17, attached as Exhibit 2 to the Appendix.) Delta prohibits all forms of unlawful discrimination, including discrimination based on gender. (*See* Ex. 1.) Likewise, Delta prohibits harassment and retaliation. (*See id*.)

Delta's non-discrimination and non-retaliation policy is readily accessible to all employees. It is included in Delta's *The Way We Fly* manual and *Code of Ethics and Business Conduct*, and it is posted on Delta's intranet and in numerous places frequented by employees throughout Delta's operations. (Ex. 2 at 62:22-63:10, 66:22-67:3.) The policy is also a periodic subject of discussion at employee briefings and other meetings.

Much of Delta's record of reliability and safety is owed to Delta's Ground Service Equipment ("GSE") department, which behind the scenes maintains the equipment that keeps Delta's operations moving. In airports around the world, Delta has a fleet of more than 100,000

---

[3] All exhibit citations are to the Appendix of Evidence attached hereto.

pieces of ground equipment, including aircraft tugs, bag tugs, belt loaders, jet bridges, de-icers, and baggage systems.

Delta hired Plaintiff in June 2009 to work as a full-time Ground Maintenance Mechanic ("GMM"), an entry-level position in the GSE department, in New York.  (Ex. 2 at 24:14-25:12.) Prior to working for Delta, Plaintiff attended college in New York then taught English in Sri Lanka.  (*Id*. at 12:1-9, 15:2-5.)  She also worked, among other things, as a campus resident assistant, a disciplinarian for a middle school, a theater technician (assisting with the lighting for shows), and as a technical writer and blogger.  (*Id*. at 15:9-19:3, 27:8-13.)

Approximately one year into her new job at Delta, Plaintiff requested an extended leave of absence so she could volunteer for a humanitarian project in India.  (*Id*. at 30:13-25.)  Delta granted her request, and she was gone for the next year.  (*See id*.)

When Plaintiff eventually returned in August 2011, she resumed her work as a GMM in New York City.  Shortly thereafter, however, Plaintiff asked to be moved from a full-time employee to a part-time employee.  (*Id*. at 25:13-26:20.) At the same time, Plaintiff also worked various side jobs, including as a technical writer and theater technician.  (*Id*. at 18:2-22:7, 27:8-18.)  Plaintiff worked only part-time as a mechanic for Delta from 2012 to 2018.  (*Id*. at 25:13-26:20.)

In 2018, Plaintiff transferred from New York City to Salt Lake City, where she switched back to full-time work as a GMM.  (*Id*. at 24:25-25:4, 25:13-26:1.)

Throughout her employment with Delta, Plaintiff used her flight benefits to travel the world and write travel blogs about her experiences.  (*Id*. at 42:2-45:13.)  In fact, according to a comment she made in a 2016 interview for a GMT position in Honolulu, she was a "blogger first

and a mechanic second," and her first question in the interview "was how much time can I take off?" (Deposition of Paul Remillard ("Remillard Depo."), 11:7-12:23, attached as Exhibit 3 to the Appendix.)

In May 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"), Charge No. 540-2020-03024 (the "First Charge"), alleging that between 2018 and 2020 she suffered sex discrimination because she was not promoted to various positions for which she applied and that she allegedly made less than her male counterparts. The First Charge was the subject of a lawsuit, *Lampe v. Delta Air Lines, Inc.*, Case No. 2:21-cv-176, pending before Judge Ted Stewart, which was ultimately dismissed for, among other reasons, Plaintiff's failure to exhaust her administrative remedies and comply with Title VII's 300-day statute of limitations (the "Dismissed Lawsuit"). Specifically, Judge Stewart ruled that any claim based on alleged discrete acts occurring prior to July 19, 2019 was time-barred and that Plaintiff failed to exhaust her administrative remedies for claims made after July 19, 2019.

During the course of briefing on Delta's motion to dismiss in the Dismissed Lawsuit, Plaintiff filed a second Charge of Discrimination with the EEOC, Charge No. 540-2021-03611, dated August 11, 2021 (the "Second Charge"). (Second Charge, attached as Exhibit 4 to the Appendix.) In the Second Charge, Plaintiff alleged that Delta discriminated against her on the basis of sex by denying her four promotions and generally failing to provide her with the same opportunities as her male colleagues to work on specialized equipment. (*See id*.)

On or about September 17, 2022, Plaintiff filed a third Charge of Discrimination with the EEOC, Charge No. 540-2021-04347 (the "Third Charge"). (Third Charge, attached as Exhibit 5

to the Appendix).  In the Third Charge, Plaintiff alleged that Delta discriminated against her on

the basis of sex because she was paid less than her male co-workers and was required to take a

mechanical aptitude test that her male colleagues were not required to take.  (*See id*.)

## STATEMENT OF UNDISPUTED MATERIAL FACTS[4]

### Delta's GSE Department

1.      There are various positions within Delta's GSE department, including Ground

Maintenance Mechanics ("GMM"), Ground Maintenance Technicians ("GMT"), and Lead

Ground Maintenance Technicians ("Lead GMT").  (Ex. 2 at 68:8-25, 77:13-17; *see also* Standard

Operating Procedure for GSE Hiring ("GSE SOP"), PLAINTIFF 00083, attached as Exhibit 6 to

Appendix.)

2.      The GMM "performs as a semi-skilled mechanic in maintenance of Ground

Support Equipment (GSE)."  (GMM Job Description, attached as Exhibit 7 to Appendix; *see also*

Ex. 2 at 86:17-22.)  The GMM "may also assist a Ground Maintenance Technician Lead or a

Ground Maintenance Technician on equipment when needed."  (Ex.7; *see also* Ex. 2 at 87:2-11;

Ex. 3 at 7:16-9:3; Deposition of Fred Woodard ("Woodard Depo."), 13:11-23, attached as

Exhibit 8 to Appendix.)  The GMM does not have any direct reports and is not a supervisory

position.  (Ex. 2 at 86:12-16.)  The GMM is "responsible for utilizing appropriate tooling,

equipment and material to accomplish minor maintenance functions including but not limited to

the following: inspections, minor troubleshooting, repairing, removing and replacing components

on all Ground Support equipment."  (*Id*. at 87:14-22; *see also* Ex. 7.)

---

[4] The facts stated by Defendant are undisputed for purposes of this motion for summary
   judgment only.

3.      A GMT is an advanced mechanic who typically works on specialized equipment. (Ex. 2 at 89:19-22.)  There is not an automatic progression from GMM to GMT, meaning, a GMM does not automatically progress to become a GMT with the passage of time.  (*See id*. at 92:18-93:4; *see also* Ex. 3 at 10:9-11:1; Ex. 6 at PLAINTIFF 00085.)

4.      A Lead GMT supervises the daily operations and workflow of GSE mechanics and maintenance on equipment.  (Ex. 2 at 152:4-12; *see also* Ex. 8 at 12:24-13:10.)  A Lead GMT must also have a thorough theoretical and working knowledge of motorized ground support equipment and must have the ability to perform as the working leader of groups of GMTs and GMMs.  (*See* Lead GMT Job Description, attached as Exhibit 9 to Appendix; *see also* Ex. 2 at 152:4-153:9; Ex. 8 at 12:24-13:10.)

***GSE Employees are Paid According to Established Pay Scales***

5.      GMMs, GMTs, and Lead GMTs are paid according to defined, gender-neutral pay scales that vary by position and increase with seniority.  (*See* Ex. 2 at 100:12-102:21, 104:1-105:17; *see also* Pay Scales, attached as Exhibit 10 to Appendix.)

6.      GSE employees may express interest in and apply for various collateral duties. (*See* Ex. 2 at 93:15-96:4.)  But such collateral duties do not change the overall position held by the GSE employee, and there is no change in pay rate associated with participation in collateral duties.  (*Id*. at 97:23-99:1.)

7.      Plaintiff voluntarily applied for various collateral duties.  At one point, for example, she acted as a Step-In Ambassador.  (Ex. 2 at 149:4-150:14.)  Later, she acted as a Training Coordinator, and eventually she became an Environmental & Safety Coordinator.  (*Id*.

at 94:23-95:12; *see also* Ex. 8 at 14:21-15:8.)  During those times, however, her position did not

change and she remained a GMM.  (Ex. 2 at 95:13-96:4.)

8.      Accordingly, when Plaintiff had collateral duties, she was still paid pursuant to

the GMM pay scale, as were other GMMs with collateral duties – for example, the male GMM

who succeeded Plaintiff as the Environmental & Safety Coordinator was also paid according to

the GMM scale, which incidentally meant that he earned less than Plaintiff who was paid at the

top end of the pay scale.  (Ex. 2 at 97:23-99:1; 99:10-101:15.)[5]

***GSE Has Established Hiring and Promotion Guidelines to Ensure Fairness***

9.      Delta follows a standard operating procedure for GSE department hiring and

promotions.  (*See* Ex. 6 at PLAINTIFF 00083; *see also* Ex. 2 at 67:20-68:12; Deposition of Mike

Maier ("Maier Depo."), 57:22-59:11, attached as Exhibit 11 to the Appendix.)

10.      For example, under the GSE SOP, the process for hiring a Lead GMT starts with

Delta reviewing and recalling any furloughed employees, if applicable.  (*See* Ex. 6 at

PLAINTIFF 00086; *see also* Ex. 2 at 77:13-21.)  Then, Delta alternates between promoting

internal candidates and approving the transfers of Lead GMTs from other Delta locations.  (Ex. 6

at PLAINTIFF 00086; *see also* Ex. 2 at 77:22-25.)

---

[5] Plaintiff will no doubt argue that while her successor (a GMM like Plaintiff) in the collateral duty volunteer assignment of Environmental & Safety Coordinator made less than she did, her predecessor made more than she did.  However, her predecessor in that volunteer position was a GMT, and was paid at his GMT rate.  This further highlights how the collateral duty positions work – employees volunteer for these collateral duties but do not get any additional pay.  Instead, they continue to be paid in whatever their current position is, be that a GMM, GMT, or something else.

11.     With respect to internal promotions to a Lead GMT position, Delta ranks and interviews candidates to determine which individual is the most qualified to fill a particular position.  (Ex. 6 at PLAINTIFF 00086.)

12.     For purposes of determining who to interview, Delta ranks applicants using various criteria, including safety, reliability, productivity, quality, aptitude/professionalism, job knowledge, equipment experience and proficiencies, education and certifications, computer skills, and leadership experience.  (Ex. 6 at PLAINTIFF 00086; *see also* Ex. 2 at 78:9-21; Ex. 8 at 18:6-19:4.)

13.     Delta's interview process for Lead GMT positions consists of a "FIT Interview Guide" consisting of questions "that display the candidates['] understanding of the position to which they are applying."  (Ex. 6 at PLAINTIFF 00086; *see also* Ex. 2 at 78:22-79:3; FIT Interview Guide, attached as Exhibit 12 to Appendix.)  Delta uses the FIT Interview Guide to make "evaluations as fair and accurate as possible."  (Ex. 12 at DLT_LAMPE_00000676.)  Delta uses the same set of questions for each candidate for each opening.  (Ex. 8 at 11:24-12:8; Ex. 11 at 45:24-46:3.)

14.     GMTs are required to take and pass the Basic Mechanical Aptitude and Reasoning ("BMAR") test unless they've already passed a prior version of the test or were otherwise grandfathered out of the requirement given their seniority.  (Ex. 2 at 160:24-161:20.) A candidate for a Lead GMT position must pass the BMAR test if they have not already passed it.  (Ex. 2 at 162:16-163:2; *see also* Ex. 8 at 27:16-28:5; Ex. 6 at PLAINTIFF 00085.)

15.     Finally, based upon the interviews, GSE management selects the most qualified candidate for the open Lead GMT position (as it does for all open positions).  (Ex. 6 at PLAINTIFF 00086.)

***Plaintiff Applied for a Department Manager Position, but Delta Selected a Candidate Who was Significantly More Qualified***

16.     In October 2020 while she was a GMM, Plaintiff applied for a Department Manager, Ground Support Equipment position (the "Department Manager") – a position multiple levels above the entry-level GMM position.  (Ex. 2 at 123:7-11; *see also* Department Manager Application Email, attached as Exhibit 13 to the Appendix.)

17.     The Department Manager supervised all GMM, GMT, and Lead GMT positions stationed in Salt Lake City and was responsible for the "safe, compliant, and economical performance of all GSE functions" at that location.  (Ex. 2 at 124:13-125:17; *see also* Department Manager Job Description, attached as Exhibit 14 to the Appendix.)

18.     Delta "strongly preferred" "frontline supervisor experience and GSE experience" for the Department Manager.  (Ex. 14 at PLAINTIFF 00082; *see also* Ex. 2 at 126:20-22.)

19.     At the time, Plaintiff had been neither a GMT nor a Lead GMT, yet she was applying for a job that would have been responsible for managing them all.  (Ex. 2 at 126:5-15.)

20.     Ultimately, Plaintiff was not selected for the Department Manager position because Delta concluded that she was not the most qualified candidate for the position.  (Ex. 2 at 127:16-21; Ex. 11 at 35:5-20.)

21.     The candidate selected for the Department Manager position, Fred Woodard, had previously been a Department Manager for Delta at the JFK airport in New York City.  (Ex. 2 at 128:15-129:4; *see also* Woodard Resume, attached as Exhibit 15 to the Appendix.)  Woodard

had significant leadership experience – supervising a team of 85 mechanics, technicians, and leads; overseeing a large budget; managing invoices, overtime, parts, and labor documents and metrics.  (Ex. 2 at 129:5-15; *see also* Ex. 15.)  Woodard was also a Master Mechanic Craftsman and had previously worked as Flight Superintendent, Shop Manager, and Aerospace Ground Equipment Technician.  (Ex. 2 at 129:24-130:5; *see also* Ex.15.)

22.     Plaintiff does not dispute that she did not have Woodard's qualifications – she had, for example, never been a department manager, never supervised a large team of maintenance workers, and had never been responsible for overseeing a budget in the GSE department – all responsibilities of a Department Manager.  (Ex. 2 at 131:1-9; *see also* Ex. 14.)

***Delta Selected a More-Qualified Candidate for the Regional Manager of GSE Contracts***

23.     Plaintiff also applied for a Regional Manager of GSE Contracts (the "Regional Manager") in October 2020.  (Ex. 2 at 131:17-132:8.)

24.     The Regional Manager is responsible for overseeing regional outstations staffed by contractors.  (Ex. 2 at 132:12-20.)  For each outstation, the Regional Manager is responsible for reviewing, managing, and resolving technical and administrative issues in the GSE department at the outstation.  (*Id*. at 134:3-11; *see also* Regional Manager Job Description, PLAINTIFF 00063, attached as Exhibit 16 to the Appendix.)  The Regional Manager provides daily oversight of regional contractor maintenance activities, while working with all operational departments of the station to ensure that all facets of the operation are supported and to maintain equipment service levels.  (Ex. 2 at 134:12-18; *see also* Ex. 16 at PLAINTIFF 00063.)  The Regional Manager also develops strategic plans and monitors operating budgets and performance plans.  (Ex. 2 at 134:19-23; *see also* Ex. 16 at PLAINTIFF 00063.)

25.     Plaintiff was not selected for the Regional Manager position because Delta concluded that she was not most qualified candidate for the position.  (Ex. 2 at 140:8-10; *see also* Ex. 11 at 26:1-27:25.)

26.     The candidate selected for the Regional Manager position, Eric Schulte, had multiple years of front-line experience with Delta.  (Ex. 2 at 145:17-21; *see also* Schulte Resume, attached as Exhibit 17 to Appendix; Ex. 11 at 26:9-27:25.)  He had previously been an Operations Service Manager, served as a program manager on specialized equipment for Delta in Seattle, Washington, worked as a liaison between Delta's Operations department and the GSE department, and established specialized operations teams for Delta in Seattle, Washington.  (Ex. 2 at 143:10-145:1; *see also* Ex. 17; Ex. 11 at 26:9-27:25.)  Schulte also had experience with optimizing Delta's performance in Seattle both financially and operationally.  (Ex. 2 at 145:12-16; *see also* Ex. 17.)

27.     Plaintiff acknowledges that, unlike Schulte, she has never been an Operations Service Manager.  (Ex. 2 at 144:15-16.)  She also admits that she did not have experience with oversight of contract maintenance workers for Delta, had never been responsible for Delta's departmental operating budgets, and, other than a few hours when she temporarily filled in as a mechanic in charge ("MIC") on a couple of shifts, she had no front-line supervisor experience. (*Id*. at 134:24-136:23.)

***Plaintiff Applied for Several Lead GMT Positions, but Delta Selected More Qualified Candidates[6]***

28.     Although she had never worked as a GMT, Plaintiff applied for a *Lead* GMT position in Salt Lake City in February 2021.  (Ex. 2 at 151:8-20; *see also* Lead GMT Application, attached as Exhibit 18 to the Appendix.)

29.     Among other things, the Lead GMT was responsible to "act as the working leader of a group of Motorized GMT's/GMM's, plan and layout work, [and] instruct and supervise the work of the group."  (Ex. 2 at 153:3-9; *see also* Ex. 9 at PLAINTIFF 00055.)  The Lead GMT job also requires the ability to work as a leader of a group of motorized GMTs.  (Ex. 2 at 153:10-15; *see also* Ex. 9 at PLAINTIFF 00056.)  The Lead GMT needs a "thorough theoretical and hands on working knowledge of motorized ground support equipment and must have achieved a satisfactory score on the entry test."  (Ex. 2 at 154:20-155:4.)  It is important for the Lead GMT to have sufficient experience working on Delta's specialized equipment because they are tasked with providing direction, assistance, and oversight of GMTs and GMMs who perform work on Delta's specialized equipment.  (Ex. 11 at 63:6-24; 69:5-70:3.)

30.     In connection with her application for the Lead GMT position, Plaintiff took the BMAR test in February 2021, and she was never required to take it again.  (Ex. 2 at 162:25-163:2.)

31.     Lead GMT roles are virtually always awarded to GMTs and not GMMs because GMMs naturally have less familiarity with specialized equipment and are less likely to have diverse experience.  (Ex. 2 at 168:1-169:21.)  In fact, it is almost unheard of for a GMM to

---

[6] Plaintiff applied for several other positions within Delta's GSE department from 2017 to 2019, but they are time-barred and thus are not at issue in this case.  (Ex. 2 at 198:1-200:10.)

promote directly to a Lead GMT position for these reasons.  (Ex. 11 at 63:9-24; Ex. 8 at 22:9-19.)

32.     Plaintiff was selected to interview for this Lead GMT position as she was ranked third among the candidates prior to her interview.  (Lead GMT Matrix, attached as Exhibit 19 to the Appendix; *see also* Ex. 8 at 6:2-23.)

33.     Plaintiff was not offered this Lead GMT role because Delta determined that she was not the most qualified candidate for the position.  (Ex. 2 at 174:16-25; Ex. 8 at 10:22-11:21, 16:9-17:3.)

34.     Plaintiff had never been a GMT, was rated "[w]eak on specialized" equipment, and did not have any certifications at the time she interviewed for the Lead GMT position in March 2021.  (Ex. 2 at 175:9-14; *see also* Ex. 19.)  She also scored lower in the leadership and automotive experience than at least two other candidates interviewing for the position.  (Ex. 2 at 175:1-8; *see also* Ex. 19.)

35.     In contrast, the two candidates selected to fill open Lead GMT roles, Samuel Leyba and Kenneth Dickinson, had significantly more leadership and relevant work experience.  (Ex. 2 at 174:20-23; *see also* Ex. 8 at 10:22-11:21, 16:9-17:3; Ex. 19.)

36.     Leyba, for example, who was already a GMT, had acted in a supervisor role every day for eight months, was more senior to Plaintiff, had more mechanic experience than Plaintiff, had various ASE certifications that Plaintiff did not have, and had more experience with specialized equipment than Plaintiff.  (Ex. 2 at 177:19-178:19; *see also* Leyba Resume, attached as Exhibit 20 to Appendix.)

37.     Likewise, Dickinson had been a GMT at Delta since 2012, had been a full-time MIC supervisor for almost one year, and had experience as a mechanic at multiple car dealerships.  (Ex. 2 at 179:4-180:7; *see also* Ex. 8 at 10:22-11:4, 37:12-38:6.)

38.     In July 2021, Plaintiff again applied for a Lead GMT position.  (Ex. 2 at 193:3-13.)

39.     Plaintiff, still a GMM, interviewed for the Lead GMT position in July 2021 with four other individuals – all of whom were GMTs.  (Ex. 2 at 194:5-13.)

40.     Delta determined that Plaintiff was not the most qualified candidate for this position.  (Ex. 2 at 194:19-22.)

41.     Unlike Plaintiff, the candidate selected for that Lead GMT position, James Belcher, had been a GMT for five years prior to his application, previously had front-line supervisor experience as a MIC, and had several certifications.  (Ex. 2 at 195:11-196:10; *see also* Ex. 8 at 37:3-16; Belcher Resume, attached as Exhibit 21 to the Appendix.)

***Delta Promoted Plaintiff to a GMT Position***

42.     In September 2021, Plaintiff applied for (and was selected for) a GMT position in Austin, Texas.  (Ex. 2 at 113:24-115:7.)  In November 2021, she moved from Salt Lake City to Austin for the position.  (*Id*. at 115:22-24.)

43.     Plaintiff was paid $46.72 per hour in the GMT position – or $18.45 per hour more than what she made as a GMM.  (*See* Declaration of Kelley Nabors, Delta Declaration, ¶ 7, attached as Exhibit 22 to the Appendix.)

***Plaintiff was Again Promoted to a Salaried Position in Atlanta***

44.     A few months later, in February 2022, Plaintiff applied for (and was selected for)
a promotion to a salaried position as a Training and Safety Specialist in Atlanta, Georgia.  (Ex. 2
at 116:20-117:12; *see also* Ex. 22 at ¶ 8.)

45.     As a Training and Safety Specialist, Plaintiff works to help develop GSE
department training programs for both motorized and stationary equipment.  (Ex. 2 at 118:4-20.)

46.     In her current role, Plaintiff makes over $110,000 per year, which is more than
twice what she made as a GMM.  (*See* Ex. 22 at ¶ 9.)

***Plaintiff's Charges of Discrimination***

47.     Plaintiff filed her first Charge of Discrimination with the EEOC against Delta in
May of 2020 (the "First Charge") which was later the subject of a Motion to Dismiss in
Plaintiff's first Lawsuit against Delta.  (*See* Order of Dismissal, attached as Exhibit 23 to the
Appendix; *see also* First Charge, attached as Exhibit 24 to the Appendix.)

48.     Plaintiff filed her second Charge of Discrimination with the EEOC against Delta
on or about August 11, 2021 (the "Second Charge").  (Ex. 4.)

49.     Plaintiff received a Notice of Right to Sue ("NTRS") on the Second Charge,
through her counsel, on or about September 18, 2021, which was acknowledged by counsel in an
email to the EEOC.  (NTRS for Second Charge, attached as Exhibit 25 to the Appendix; *see also*
Email correspondence between M. Anderson-West and P. Miner, dated November 19, 2021
through November 22, 2021, attached as Exhibit 26 to the Appendix.)

50.     Plaintiff alleges in the Second Charge that Delta subjected her to unlawful
discrimination based on her sex as follows:

a.  Between August 15, 2020 and August 11, 2021, Plaintiff was denied the same opportunities to work with specialized equipment than her male counterparts.  (Ex. 4.)

b.  In October, November, and December 2020 Plaintiff was denied security badges at outstations that were are necessary to gain experience with specialized equipment.  Plaintiff alleges her male counterparts were given security badges.  (*Id*.)

c.  In October 2020, Plaintiff applied for Department Manager GSE, a position for which she alleges she was fully qualified.  Plaintiff alleges that Delta chose a male employee that had been employed for one year with Delta compared to her 11 years with the Delta.  (*Id*.)

d.  In December 2020, Plaintiff applied for promotion to GSE Regional Contracts Manager.  Plaintiff alleges she exceeded the qualifications listed by Delta for the position.  Plaintiff alleges Delta passed her over and gave the position to a less qualified male employee.  (*Id*.)

e.  Between November 2020 and March 2021, Plaintiff alleges Delta never chose her to monitor de-icing operations.  Instead, the opportunity to work on specialized equipment was always given to male employees.  (*Id*.)

f.  In March 2021, Plaintiff applied for promotion as Lead GMT.  Plaintiff was required to take a "qualifying test" that she had taken in the past and passed.  Plaintiff alleges the male applicants for the Lead GMT position were not required to take a qualifying test.  (*Id*.)

g.  In June 2021, Plaintiff's male counterparts were able to work overtime which Plaintiff was not offered.  (*Id*.)

h.  In July 2021, Plaintiff applied for another Lead GMT position and was interviewed for the position but the position was offered to a less qualified male.  (*Id*.)

i.  Between August 14, 2020 and August 10, 2021, Plaintiff's hourly wage was $28.27 per hour and her male counterparts earned $46.72 per hour.  (*Id*.)

51.  On or about September 17, 2021, Plaintiff filed her third Charge of Discrimination with the EEOC against Delta (the "Third Charge").  (Ex 5.)

52.     Upon receipt of the Third Charge, the EEOC emailed Plaintiff's counsel and asked her about the status of Plaintiff's litigation given that the NTRS had been issued for the Second Charge and "the clock is running to file suit for [the Second Charge]."  (Email Correspondence from P. Miner to M. Anderson-West, dated September 21, 2021, attached as Exhibit 27 to the Appendix.)

53.     Plaintiff received a NTRS on the Third Charge, through her counsel, on or about October 27, 2021.  (NTRS for Third Charge, attached as Exhibit 28 to the Appendix; *see also* Ex. 26.)

54.     Plaintiff alleges in the Third Charge that Delta subjected her to unlawful discrimination "from August 11, 2021 [to] September 17, 2021" based on her sex as follows:

a.     Plaintiff was required to take the BMARS mechanical aptitude test when she applied for a promotion when the male candidates did not have to take the BMARS mechanical aptitude test. (Ex. 5 at 1.)

b.     Delta paid Plaintiff $18.45 per hour less as the Environmental and Safety Coordinator than it paid the male employee who held the same position prior to Plaintiff.  (*Id*. at 2.)

c.     As Training Coordinator, Plaintiff was paid $28.27 per hour versus the male employees that held the same position who were paid $46.72 per hour.  (*Id*. at 2.)

**ARGUMENT**

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "If the moving party demonstrates that there is no genuine issue of material fact as to the existence of any element essential to the non-moving party's case, then summary judgment is

appropriate." *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1428 (10th Cir. 1996). "Failure of proof

concerning an essential element . . . renders all other facts immaterial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). The mere existence of a scintilla of evidence in support of the non-

moving party's case is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The undisputed material facts stated above establish that Delta should prevail on summary

judgment on each of Plaintiff's claims.

## II.    PLAINTIFF'S CLAIMS ARE TIME-BARRED AS A MATTER OF LAW.

Plaintiff's Title VII claims, which are asserted in the Second Charge, are time-barred

because she failed to file her Complaint within ninety days of receiving the Notice of Right to

Sue (the "NRTS") from the EEOC for that charge. Additionally, Plaintiff's claims based on any

alleged unlawful act occurring over 300 days prior to the filing of the Third Charge are untimely

as a matter of law.

### A.    Plaintiff's Title VII Claims Based on the Allegations in the Second Charge are Time-Barred as She Failed to File Suit Within 90 Days of Receiving the NRTS from the EEOC.

Contrary to Plaintiff's false assertion in the Complaint that she received a NRTS from the

EEOC for both the Second Charge and Third Charge on the same day, i.e., on October 27, 2021

(Compl. at ¶ 3), the undisputed evidence shows that Plaintiff actually received the NRTS for the

Second Charge on September 18, 2021. (*See* Ex. 25; *see also* Ex. 26.)

Title VII provides that within ninety days after the issuance of a right-to-sue letter "a civil

action may be brought against the respondent named in the charge." *See* 42. U.S.C. § 2000e-

5(f)(1). This ninety-day period is "in the nature of a statute of limitations." *Keeler v. Cereal

Food Processors*, 250 Fed. App'x. 857, 860 (10th Cir. 2007) (dismissing claims as time-barred

for plaintiff's failure to file suit within ninety days of receiving the right-to-sue letter from the

EEOC); *see also Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 104 S.Ct. 1723

(1984) (holding that no equitable tolling applied to ninety-day statutory deadline to file suit

pursuant to Title VII because the right-to-sue letter clearly stated that the plaintiff was required

to file suit within ninety days of receipt of the letter and was reminded of the deadline on at least

two other occasions).

In this case the NRTS for the Second Charge was issued on September 18, 2021.

(Ex. 25.)  The NRTS states that for claims under Title VII, Plaintiff's lawsuit, if any, "**must be

filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or [Plaintiff's] right to sue based on

this charge will be lost."  (Ex. 25 (emphasis in original).)

Only a few days after issuing the NRTS (after Plaintiff had filed her Third Charge with

the EEOC), the EEOC reminded Plaintiff's counsel that the NRTS was issued for the Second

Charge and that "the clock is running to file suit for that case." (Ex. 27.)  On November 19,

2021, Plaintiff's counsel acknowledged to the EEOC that she had received the NRTS for the

Second Charge on September 18, 2021, and that her deadline to sue for the Second Charge was

approaching.  (*See* Ex. 26.)

Although the EEOC mistakenly issued a second NRTS for the Second Charge on

October 27, 2021, the EEOC (prompted by Plaintiff's counsel) confirmed that the issuance of

that second NTRS for the Second Charge was a clerical error and the NRTS issued on

October 27, 2021 was meant to be issued for the Third Charge.  (*See* Ex. 26.)  Put simply, the

EEOC made clear that the second NRTS for the Second Charge was issued by mistake and that

the operative NRTS on the Second Charge was issued on September 18, 2021.  Thus the 90-day

deadline for suit on Plaintiff's Title VII claims began to run on September 18, 2021.  (*See id*.)

Nevertheless, despite Plaintiff's explicit acknowledgment of the EEOC's mistake, she falsely

alleges in the Complaint that she received the NRTS for the Second Charge on October 27, 2021.

(Compl. at ¶ 3.)

The Second Charge submitted by Plaintiff to the EEOC dated August 11, 2021 alleges

"[d]iscrimination based on . . . sex" and checks no other box for unlawful discrimination, though

in the body of the Second Charge Plaintiff alleges violations "under the Civil Rights Act of 1964

. . . and the Equal Pay Act of 1963."  (*See* Ex. 4.)  In the Second Charge, Plaintiff alleges that

Delta discriminated against her by (1) failing to provide her with training on specialized

equipment by, among other things, failing to grant her security badges to various outstations and

denying her the opportunity to work on de-icing operations; (2) denying her four promotions;

and (3) paying her less than her male counterparts.  (*See id*.)

Because Plaintiff filed her Complaint on January 11, 2022, nearly one month after the 90-

day statutory deadline, all of Plaintiff's Title VII claims based on the allegations in the Second

Charge are time-barred as a matter of law.  Thus, Plaintiff's Title VII gender discrimination

claims, including her failure to promote and unequal pay claims, may not be considered as part

of Plaintiff's Title VII claim.  (*See* Compl., ¶¶ 14-35, 37-47.)

### B.     Plaintiff's Claims Arising Prior to November 21, 2020 Are Untimely as a Matter of Law.

"Under Title VII, a person must file a charge of discrimination with the EEOC within 300

days of the alleged unlawful employment practice . . . ."  *Payan v. United Parcel Serv.*, 905 F.3d

1162, 1169 n.1 (10th Cir. 2018) (citing 42 U.S.C. § 2000e-5(e)); *see also Fort Bend County v.*

*Davis*, 139 S. Ct. 1843, 1849 (2019) (noting that claim processing rules, like the administrative

filing requirement of Title VII, "may be 'mandatory' in the sense that a court must enforce the rule if a party properly raise[s] it" (quotations and citations omitted) (alteration in original)). Discrete acts such as termination, *failure to promote*, denial of transfer, or refusal to hire each constitute a separate actionable unlawful employment practice. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 2073 (2002) (emphasis added); *see also Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 628 (10th Cir. 2012) ("Discrete unlawful practices include termination, failure to promote, denial of transfer, and refusal to hire."). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Daniels*, 701 F.3d at 628.

Given that Plaintiff's Title VII claims based on the allegations in the Second Charge are time-barred (as discussed previously), the operative EEOC charge for Plaintiff's Title VII claim is the Third Charge, which was filed on September 17, 2021. Under the Third Charge, all allegations occurring prior to November 21, 2020, or 300 days prior to the filing of the Third Charge, are time-barred as a matter of law. *Payan*, 905 F.3d at 1169 n.1. Thus, Plaintiff's claims for failure to promote to the Department Manager position or that she was denied opportunities to work on projects at Delta's outstations, are time-barred as a matter of law for this additional reason and may not be considered as a basis for Plaintiff's Title VII claims. *See id.*; *see also* Compl., ¶¶ 14-20, 25-27 and 32.[7]

---

[7] Additionally, Plaintiff was not qualified for assignment to various outstations because she was not a GMT and because the equipment generally located at outstations is specialized, which a GMM is not qualified to work on without GMT or Lead GMT supervision. (Ex. 8 at 26:21-27:7.)

III.   **ALTHOUGH THEY ARE ALL TIME BARRED, PLAINTIFF'S TITLE VII CLAIMS FAIL AS A MATTER OF LAW FOR ADDITIONAL REASONS**

A.   **Discrimination Claim Generally.**

Gender discrimination claims brought pursuant to Title VII are all analyzed under a well-established burden-shifting scheme.  *See Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (addressing claim of gender discrimination and noting that a charging party "bears the ultimate burden of proving her employer intentionally discriminated against her" because of gender).  First, the plaintiff must establish a prima facie case of discrimination.  *Id.* at 1266.  If the plaintiff establishes a prima face case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  Then, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason for the adverse action is a pretext for discrimination.  *Id.*

B.   **Plaintiff's Title VII Claim for Unequal Pay Fails as a Matter of Law.**

As an initial matter, Plaintiff's claim for unequal pay under Title VII based on allegations in the Second Charge, i.e., unequal pay between August 14, 2020 and August 10, 2021, is time-barred, as discussed in Section II(A) above.  Thus, the only unequal pay allegation remaining (from the Third Charge) is that Plaintiff was paid less than her male counterparts in the Training Coordinator and Environmental & Safety Coordinator assignments for the three-week period between August 11, 2021 through September 17, 2021.

In any event, Plaintiff's unequal pay claim fails as a matter of law for the simple reason that she was not paid less than other similarly situated male GMMs.  And any attempts to compare her pay to male GMTs is unavailing, as she was not a GMT.

A Title VII plaintiff on an unequal pay claim "has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; [and] the male employees were paid more under such circumstances." *Sprague v. Thorn*, 129 F.3d 1355, 1363-64 (10th Cir. 1997) (explaining that a Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males).

No evidence in the record exists of any male GMM with the same seniority who earned more than Plaintiff.  Indeed, during the relevant period, Plaintiff was paid at the top of the GMM pay scale.  Delta's established pay scales do not take into account an employee's gender. (Ex. 10.)

Confronted with the fact that she cannot challenge Delta's pay scale as discriminatory, Plaintiff instead alleges that her pay was discriminatory because it did not change when she voluntarily accepted two collateral assignments – the Training Coordinator and Environmental & Safety Coordinator roles.  (Ex. 2 at 93:25-95:16.)  Collateral assignments are entirely voluntary. (*See id*. at 95:5-96:4.)  Employees who fill these collateral assignments in connection with their regular jobs are paid their regular rate, which is determined by their position and Delta's established pay scales.  (*See id*. at 97:23-99:9.)  Thus, GMMs who fill a collateral assignment are paid their GMM rate and GMTs who fill collateral assignments are paid their GMT rate.  (*Id*.)

Plaintiff concedes she was paid according to Delta's established pay scale (like her male colleagues), which is strictly based on seniority, for all the work she performed while she was a GMM, including her collateral assignments.  (*Id*., 97:23-99:9.)  Plaintiff also concedes that her

male colleagues who also filled collateral positions before and after her were also paid according to Delta's established pay scale.  (*See id*.)  Naturally, therefore, for those collateral assignments that were filled by GMTs, those employees earned a higher wage, regardless of gender.  On the other hand, Plaintiff's male successor in a collateral assignment was a GMM with less seniority than Plaintiff; consequently, he was paid less than Plaintiff in that collateral assignment. (*See id*. at 99:10-101:15.)  Because Plaintiff has no evidence that her pay was in way discriminatory based upon her gender, her Title VII unequal pay claim fails as a matter of law.[8]

### C.    Even if Plaintiff's Title VII Claims Were Not Time-Barred, Her Failure to Promote Claims Also Substantively Fail as a Matter of Law.

####    i.    Plaintiff Cannot Establish a Prima Facie Case on her Time-Barred Title VII Claims, including her Failure to Promote Claims.

Each of Plaintiff's Title VII failure to promote claims is time-barred, as they are each based on allegations made in the Second Charge (with one position occurring in December 2019, i.e., more than 300 days before the filing of the Second and Third Charges which is barred for this reason as well).  *See* Section II(A) above.  Even if they were not, Plaintiff's failure to promote claims substantively fail as a matter of law as there is no genuine material dispute that she was not qualified for any of the positions at issue in this case.

In order to establish a prima facie claim of failure to promote under Title VII, Plaintiff must "show that there were promotional opportunities available that were filled by males, that

---

[8] To the extent Plaintiff's Title VII unequal pay claims try to re-package her time-barred failure to promote claims by arguing that she was unfairly paid because she did not receive various promotions her argument fails because "the phrase 'discrimination in compensation' means paying different wages or providing different benefits to similarly situated employees, not promoting one employee but not another to a more remunerative position."  *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 630 (10th Cir. 2012) (quoting *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374 (D.C.Cir. 2010)).  She cannot turn her unequal pay claim into a failure to promote claim.

she was qualified for promotion, and that despite her qualifications she was not promoted."
*Sprague v. Thorn Americas, Inc*., 129 F.3d 1355, 1362 (10th Cir. 1997) (citation omitted).
Employers have "wide latitude in setting job standards and requirements" for positions "and in
deciding whether applicants meet those standards." *Salemi v. Colorado Pub. Employees' Ret.
Ass'n*, 747 F.App'x 675, 691 (10th Cir. 2018). And "[s]uccessful performance at a lower
position does not establish that an employee is qualified for a higher position even where there is
some overlap between the duties of the lower and higher positions." *Id*. at 691.

Each of the positions that underpin Plaintiff's failure to promote claims were ultimately
filled by the most qualified candidate, which is not genuinely or materially disputed by Plaintiff
(in fact, Plaintiff had no real knowledge of the other candidates' qualifications and had no reason
to doubt the qualifications listed in each candidates' resume). (Ex. 2 at 141:11-15, 144:10-14,
145:7-16, 177:3-5, 178:20-22.)

The first position at issue, the GSE Department Manager, for which Plaintiff applied on
October 17, 2020, was filled by Woodard, a Delta employee who worked as a GSE Department
Maintenance Manager at the JFK airport in New York City for Delta. (Ex. 2 at 128:15-129:4,
129:5-15, 129:24-130:5; *see also* Ex. 15.) Woodward had also previously supervised a team of
85 mechanics, technicians, and leads, oversaw a large budget for Delta, and managed invoices,
overtime hours, parts, equipment downtime, and labor metrics within his department. (*See id*.)
Plaintiff conceded she had none of Woodard's experience. (Ex. 2 at 131:1-9.) In essence,
Plaintiff was requesting to bypass working as a GMT and a Lead GMT and go straight to the
GSE Department Manager position. (*Id*. at 126:5-15.) Woodard, on the other hand, had the

relevant experience Delta was seeking and thus was determined to be the most qualified candidate for the GSE Department Manager position.  (*See id*. at 131:1-9.)

Second, Plaintiff applied for the Regional Manager position in October 2020.  (Ex. 2 at 131:17-132:8.)  The Regional Manager position required a candidate with significant leadership experience and experience managing budgets and operations of a department.  (*Id.* at 132:12-20, 134:3-23.)  Plaintiff concedes that Schulte, the employee who filled the Regional Manager position, possessed significant and specific experience as an Operations Service Manager, as well as additional managerial experience prior to his employment with Delta.  (*Id*. at 143:20-145:1, 145:12-16, 145:17-21; *see also* Ex. 17.)  Plaintiff agreed that she did not have the breadth and depth of experience possessed by Schulte.  (*Id.* at 144:15-16, 134:24-136:23.)

Third, Plaintiff applied for a Lead GMT position in February 2021.  (Ex. 2 at 151:8-20.)  Plaintiff was not even a GMT at the time of her application for the Lead GMT position, which required that she skip over the GMT position for a promotion – an exceedingly rare occurrence within Delta's GSE department.  (*Id*. at 169:14-171:14.)  In fact, Plaintiff admitted that she was only aware of two other Lead GMTs, *nationwide*, who had ever achieved this rare feat.  (*See id*.)  Plaintiff does not dispute that the candidates chosen for the Lead GMT roles had been GMTs for years prior to promoting to the Lead GMT roles and had front-line supervisory experience – experience she did not have.  (*Id*. at 177:19-178:19, 179:4-180:7.)  Indeed, Plaintiff objectively ranked lower than three of the five other candidates for the Lead GMT role.  (*Id*. at 174:16-25; *see also* Ex. 19.)  Further, Plaintiff's allegation that she was required to take the BMAR test on multiple occasions when her male colleagues were not required to do the same is false.  In her sworn deposition, Plaintiff admitted to only taking the test on one occasion (rather than the three

times alleged in paragraph 46 of the Complaint), and she acknowledged that all GMTs were required to take the BMAR test – thus requiring that Plaintiff, a GMM, take the test because she was seeking to skip the GMT role for the Lead GMT position.  (Ex. 2 at 168:1-169:21.)

Fourth, Plaintiff applied for another Lead GMT role in August 2021.  (*Id*. at 193:3-13.) Again, Plaintiff was competing as a GMM against a GMT for this position.  (*Id*. at 168:1-169:21.)  The employee who filled the position was a GMT with significant front-line managerial experience – facts the Plaintiff does not (and cannot) dispute.  (*Id*. at 195:11-196:10.) Plaintiff also does not dispute that she did not have the same experience, including leadership experience and other relevant certifications, as the candidate selected for the position.  (*See id*.)[9]

There is no genuine or material dispute that each candidate selected for the positions discussed herein (and which are the subject of Plaintiff's Complaint) was the most qualified candidate for the respective position.  (Ex. 2 at 131:1-9; 144:15-16, 134:24-136:23, 174:16-25; 177:19-178:19; 179:4-180:7; 195:11-196:10.)  Indeed, each candidate was selected according to Delta's gender-neutral procedures for candidate interview and selection.  (*See id*., 67:20-68:12.) In sum, Plaintiff cannot establish a prima facie case for gender discrimination based on her time-barred allegations of failure to promote because she was not qualified, much less the most qualified candidate, for any of the positions at issue.

---

[9] Plaintiff also complains about Delta's failure to promote her to a Technical Analyst position that she applied for in December 2019.  (Ex. 2 at 200:13-21; *see also* Ex. 22 at ¶¶ 10-11.)  But this position is time-barred given that if falls more than 300 days before the filing of the Second and Third Charges.  While Plaintiff's Complaint alleges that she applied for the Technical Analyst position in December 2020, Delta's records show that she actually applied for the position in December 2019.  (Ex. 22 at ¶¶ 10-11.)  Plaintiff concedes it is possible that her application for the Technical Analyst position could have been in December 2019.  (Ex. 2 at 200:11-21.)  In any event, Plaintiff was not selected because she was not qualified for the position.  (*Id*. at 202:3-16, 204:20-205:12.)  Plaintiff, for example, lacked a technical degree in a related field, which was a requirement of the position.  (*Id*. at 202:3-11.)

Delta is entitled to judgment as a matter of law on all of Plaintiff's Title VII claims because she cannot establish a prima facie case of gender discrimination.  *Sprague*, 129 F.3d at 1362.[10]

      ii.      <u>Delta's Hiring Decision for Each Position Were Legitimate and Nondiscriminatory</u>.

Even if Plaintiff could establish a prima facie case of gender discrimination (which she cannot), Delta has satisfied its burden of articulating a legitimate, non-discriminatory business reason for not promoting Plaintiff to the positions at issue.  *See Bennett*, 792 F.3d at 1266.  As explained above, Plaintiff was not qualified, much less the most qualified candidate, for any of the challenged positions.

      iii.      <u>No Evidence of Pretext Exists with Respect to Delta's Hiring Decisions</u>.

Delta has provided a legitimate, non-discriminatory reason for not promoting Plaintiff; therefore, the burden shifts to her to prove that Delta's reason is a pretext for illegal discrimination.  *See Timmerman v. U.S. Bank,* 483 F.3d 1106, 1113 (10th Cir. 2007).

In analyzing pretext, courts "consider the facts as they appeared to the person making the decision, and [they] do not second-guess the employer's decision."  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007).  "The reason for this rule is plain: [the Court's] role is to prevent intentional discriminatory hiring practices, not act as a 'super personnel

---

[10] To the extent Plaintiff is claiming that she was denied various opportunities for experience, i.e., to work on specialized equipment, assignments at outposts, and the issuance of maintenance security badges, such allegations are time-barred, and also fail as a matter of law on their merits as she cannot establish a prima facie case. Specifically, none of these alleged acts of discrimination qualify as discrete adverse employment actions.  *Wheeler v. BNSF Ry. Co.*, 418 Fed. App'x 738, 746-48 (10th Cir. 2011) (holding that a failure to transfer an employee at the employee's request does not qualify as an adverse employment action); *see also Faragella v. Douglas County School Dist. RE 1*, 411 Fed App'x 140, 156 (10th Cir. 2011) ("A mere inconvenience or an alteration of job responsibilities does not constitute an adverse employment action.")  Thus, these time-barred claims also substantively fail.

department,' second guessing employers' honestly held (even if erroneous) business judgments." *Id.* (quotations and citation omitted); *see also Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005) (explaining that courts "may not 'act as a super personnel department that second guesses employers' business judgments'" (citation omitted)).  In other words, courts may not determine if an employment decision "was an unwise, unfair, or incorrect decision; instead, [they] look to whether the employer honestly believed the reason given and acted in good faith on that belief." *Thomas v. Avis Rent A Car*, 408 F. App'x 145, 158 (10th Cir. 2011).

In determining who to promote to the positions at issue, Delta evaluated candidates using objective criteria, including the candidates' performance records, resumes, experience, productivity, job knowledge, and reliability.  As a result of that process, Delta concluded that Plaintiff was not the most qualified applicant for any of the open positions.  (Ex. 2 at 127:16-21; 140:8-10; 174:16-25; 194:19-21.)  Plaintiff has no evidence that Delta determined that she was less qualified because of her gender.  (*See id*.)  Thus, she cannot establish pretext, and her claim fails as a matter of law.

## IV.    PLAINTIFF'S EQUAL PAY CLAIMS FAIL AS A MATTER OF LAW

As with Plaintiff's Title VII unequal pay claims, Plaintiff's Equal Pay Act ("EPA") claims fail as a matter of law because she cannot show (nor does she attempt to show) that she was paid less than other GMMs with similar seniority for the two collateral volunteer duties she performed.

To establish a prima facie case under the EPA, Plaintiff "has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the job; (2) the conditions

where the work was performed was basically the same; [and] (3) the male employees were paid more under such circumstances." *Sprague*, 129 F.3d at 1364.

As discussed previously, Plaintiff concedes that the pay disparities between her and her identified male colleagues for the collateral duties are a result of their GMT positions (as opposed to Plaintiff's GMM position) and seniority according to Delta's pay scales, which are not based on gender. (Ex. 2 at 97:18-99:1.) Thus, like Plaintiff's Title VII unequal pay claims, Plaintiff's EPA claims fail as a matter of law. *Riser v. QEP Energy*, 776 F.3d 1191, 1198 (10th Cir. 2015) ("A bona-fide gender-neutral pay classification system constitutes a 'factor other than sex' under the EPA." (citation omitted)). And to the extent Plaintiff's EPA claims are supported by her allegation that she was paid unequally to her male colleagues who performed the same collateral duties, her argument fails because the inquiry "rests on primary, as opposed to incidental or insubstantial job duties." *Mulhall v. Advance Sec., Inc*., 19 F.3d 586, 592 (11th Cir. 1994).

## CONCLUSION

For all of the foregoing reasons, Delta respectfully requests that the Court enter summary judgment in Delta's favor on all Plaintiff's claims and that Delta be awarded its fees and costs in connection with its defense of Plaintiff's claims.

DATED this 17th day of April, 2023.

RAY QUINNEY & NEBEKER P.C.

*/s/ Katherine E. Priest*
Frederick R. Thaler
David B. Dibble
Katherine E. Priest
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of April, 2023, I electronically filed

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** using the CM/ECF system of the

District Court of the State of Utah which sent notification of such filing to:

> Michelle Anderson-West
> ANDERSON-WEST LAW
> 7901 South 3200 West, #1153
> Salt Lake City, Utah 84084
> michele@andersonwestlaw.com

*/s/ Doris Van den Akker*

1633305

34