Michele Anderson-West (9249)
**ANDERSON-WEST LAW**
9980 South 300 West, Suite 200
Sandy, Utah 84070
801.830.1958
michele@andersonwestlaw.com

*Attorney for Plaintiff Blair Lampe*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLAIR LAMPE, an individual<br><br>Plaintiff,<br><br>vs.<br><br>DELTA AIR LINES, INC., a foreign corporation,<br><br>Defendant. | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT**<br><br>Case No. 2:22-cv-00055<br><br>Judge: Tena Campbell<br><br>Magistrate Judge: Daphne A. Oberg |

Plaintiff Blair Lampe, pursuant to DUCivR 56-1 and Fed. R. Civ. P. 56(a), through her undersigned counsel, respectfully moves the Court for partial summary judgment as to her first cause of action.

## I.      INTRODUCTION AND RELIEF SOUGHT

Lampe started working for Defendant Delta Air Lines, Inc. (Delta) as a Grounds Maintenance Mechanic (GMM) in Delta's Ground Support Equipment (GSE) department in June 2009.

1

Between 2009 and 2021, Lampe applied for 14 promotions, for which she met or exceeded the job qualifications. In one instance, the decision makers rejected Lampe without interviewing her and offered the position to someone who did not meet the job qualifications. In other instances, as described below, the mangers with decision making authority artificially inflated male candidates' credentials and significantly diminished Lampe's credentials. And then, promoted the males who were less qualified than Lampe.

Currently, Delta employs 637 people who work in GSE in mechanical-technical roles. Out of the 637 employees, 630 are men. One decision maker said, there is such a disparity between males and females working in GSE is because "it is a male dominated industry" and "technician and mechanic positions at Delta Airlines are predominately male positions." Another decision maker said the reason for the disparity between the number of male and female employees in GSE is because Delta "seeks to hire the most qualified people." HR said the disparity between male and female employees was attributed to the "fact" that "women do not choose "that position" and further, "in Utah women don't even work outside the home."

2

Instead of considering Lampe on her merits as compared to the male candidates' merits, throughout the application, interview and hiring processes, the decision makers systematically inflated male candidates' qualifications and experience while at the same time, diminishing Lampe's qualifications.  Then, after hiring a male candidate without the education and experience of Lampe, the decision makers simply said that Lampe was not selected "because the interview process did not hire her" or said, "she was not the most qualified."  Delta's excuses are pretext.

Lampe respectfully asks the Court to grant her motion for partial summary judgment and to find, as a matter of law, that Lampe is entitled to relief and damages arising out of Delta's unlawful conduct.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Lampe is female. *Compl. ¶8, Answer, ¶8*.

2. Between June 2009 and September 2021, Lampe worked for Delta as a GMM.  *Compl. ¶8, Answer, ¶8*.

3. Lampe's job duties and responsibilities as GMM included, but were not limited to inspection, testing, maintenance, repair, documentation, troubleshooting and diagnosis of GSE motorized equipment, as well as additional compliance, administrative, and coordinator responsibilities. *Lampe Decl.¶4*.

3

4.      While working for Delta for the past 13 years, Lampe has always met or exceeded Delta's expectations.  *Woodard Depo. 25:23-26:3*, *Ex. 2*, *Ex. 3*, *Ex. 34*, *Ex. 54*.

5.      Fred Woodard (Woodard) Lampe's supervisor described Lampe saying: [s]he has tremendous drive and a great interest in seeing SLC GSE both shop and its team members succeed. She is easy to talk to, thinks before she speaks, at least as far as I can see, is passionate about every task she is given to do it in the best possible manner and with quality, looks for alternative solutions to problems, she respects everyone for what they do, she is sharply dressed, arrives early to work, Blair Lampe is Delta." *Ex. 2*.

6.      Woodard also said, of Lampe, ". . . her background shows she has actually been in supervision and management roles before, and has the best organization skills I have seen in a while, not afraid to reach out for information and is very good at it, does not seem to be intimidated by anyone, and so far very respected in what she has done and still doing with safety and environmental for the shop. In observing her for the past several months I have seen she does not let set back slow her down or diminish her energy arriving every day as well as her making everyone around her feel better about the day's work." *Ex. 2*.

4

7.      In October 2020, Delta posted a job opening for Department Manager, GSE. *Ex. 5*.

8.      The minimum qualifications for consideration, required that the candidate

- Embrace diverse people, thinking and styles.

- Consistently make safety and security, of self and others, the priority.

- Demonstrate exceptional management and leadership skills, administrative and organizational skills, and strong interpersonal skills.

- Work well under pressure, operate in a timely manner, and capable of handling multiple tasks with continually changing priorities.

- Have excellent oral and written communication skills, the ability to work well in a team environment, and a high degree of self-discipline.

- Must be able to support and enforce company policies and procedures. *Ex. 5*.

9.      Preferred qualifications included having front-line supervisory and GSE experience and either a bachelor's degree or 5 plus years of relevant experience. *Ex. 5*.

10.     Lampe met the preferred qualifications, and she submitted her resume for consideration. *Ex. 5*, *Ex. 6*, *Ex. 7*.

11.     The decision maker as to interviews and hiring for the GSE Manager was Mike Maier (Maier), General Manager over GSE-Motorized. *Ex. 8*, *Ex. 55*, *Maier Dep. 91:16-17*.

12.     Maier rejected Lampe's application without giving her an opportunity to interview. *Ex. 8*, *Ex. 9*, *Ex. 55*, *Maier Dep. 91:16-17*.

13.     Maier invited Eric Schulte (Schulte) to interview for the position even though Schulte did not meet the preferred job qualifications. *Ex. 10*, *Ex. 12*, *Ex. 13*.

14.     Maier interviewed Fred Woodard (Woodard) to interview for the GSE Manager position, even though Woodard's seniority at the time of his application should have disqualified him based on Delta's Internal Mobility Policy.  *Ex. 1*, *Ex.10*, *Ex. 12*, *Ex.13*, *Ex. 18*.

15.     In comparing Lampe's resume and Woodard's resume, Lampe had worked in Delta's Motorized GSE department for 11 years with considerable outside leadership experience, while Woodard had worked in Delta's Stationary GSE department for less than one year. *Ex. 7*, *Ex. 8*, *Ex. 9*, *Ex. 12*.

16.     Notwithstanding the above, Maier gave Woodard the position placing him as Lampe's supervisor beginning in December 2020. *Ex. 9*, *Ex. 48*.

6

17.     Maier said Lampe was not selected for the position because "she was not the most qualified based on the interview, the resume review." *Ex. 6*, *Ex. 7*, *Ex. 8*, *Ex. 9*, *Ex. 55*, *Maier Depo. 35:10-15*.

18.     Maier's reasons, although made under oath and under penalty of perjury, cannot be true because Maier did not interview Lampe, he just rejected her outright. *Ex. 6*, *Ex. 7*, *Ex. 8*, *Ex. 9*, *Ex. 55*, *Maier Depo. 35:10-15*.

19.     In December 2020, Delta asked Lampe to be a Training Coordinator, in addition to her regular duties as GMM and Lampe accepted the position. *Ex. 56*, *Lampe Depo. 95:8-96:18*.

20.     As the Training Coordinator, Lampe monitored and updated training records, liaised with GSE leadership to ensure training compliance, coordinated local training activities, conducted audiometric testing, assisted employees with training issues and held multiple certifications and responsibilities which were typically held and performed by GMTs, Lead GMTs, and managers. *Lampe Decl.¶5*.

21.     Delta paid Lampe $28.27 per hour while she worked as GMM and the Training Coordinator. *Ex. 37*, *Lampe Decl.¶6*.

22.     Delta paid the male employee, who held the Training Coordinator position prior to Lampe, at least $46.72 per hour. *Ex. 35*, *Ex. 36*, *Ex. 37*, *Lampe*

*Decl.¶7.*

23.      In March 2021, Lampe took on the role of GSE Environmental and Safety Coordinator in addition to working as a GMM. *Lampe Decl.¶8.*

24.      Lampe's duties and responsibilities as GSE Environmental and Safety Coordinator included but were not limited to oversight and development of safety and environmental initiatives, purchasing and invoice approval, process improvement, inspections and auditing, waste inventory and disposal, and numerous administrative tasks. *Ex. 38, Lampe Decl.¶9.*

25.      Delta paid men performing the same responsibilities as Lampe concurrently in other GSE operations were paid at least $46.72 per hour while Delta paid Lampe $28.27 per hour. *Ex. 35, Ex. 36, Ex. 37, Ex. 38, Ex. 45, Ex. 48, Lampe Decl.¶10.*

26.      In or around October 2020, Delta posted an open position for GSE Regional Contracts Manager. *Ex. 14.*

27.      The minimum qualifications listed for the GSE Regional Contracts Manager position included:

- Candidate must have knowledge of Ground Support Equipment maintenance functions.

- Consistently make safety and security, of self and others, the priority.

- Demonstrate exceptional management and leadership skills, administrative and organizational skills, and strong interpersonal skills.

- Work well under pressure, operate in a timely manner, and capable of handling multiple tasks with continually changing priorities.

- Have excellent oral and written communication skills, the ability to work well in a team environment, and a high degree of self-discipline.

- Demonstrate ability to understand departmental budgets and capability to install an effective cost reduction strategy.

- Must be able support and enforce company policies and procedures.

- Must be available 24/7 via cell phone, Internet, pager, or office.

- Must be performing satisfactorily in present position. *Ex. 14*.

28.    The preferred qualifications listed for the GSE Regional Contracts Manager position were having a bachelor's degree or 5 plus years of relevant experience, front-line supervisory experience.  GSE experience was listed as strongly preferred. *Ex. 14*.

29.    Lampe's experience exceeded the preferred qualifications and she applied for the position. *Ex. 7*, *Ex. 14*.

30.     The decision makers as to interviewing and hiring for the GSE

Regional Contracts Manager position were Maier and Patrick Dorismond

(Dorismond). *Ex. 16*.

31.     Maier and Dorismond invited Lampe, Schulte, Coleman, and Austin

Redd (Redd) to interview. *Ex. 17*, *Ex. 44*, *Ex. 55*, *Maier Depo. 99:23- 100:7*.

32.     Schulte had no maintenance experience in GSE and did not meet the

minimum qualifications for the position. *Ex. 10*.

33.     Redd did not meet preferred qualifications for an interview.  *Ex. 7*, *Ex.

10*, *Ex. 14*, *Ex. 15*.

34.     Maier and Dorismond used a matrix, that Maier made, which they

said was to input information taken directly from the candidates' resumes in order

to rate them. *Ex. 16*.

35.     The data the decision makers entered on the matrix was inconsistent

from the information listed on the candidates' resumes. Ex. 7,  *Ex. 10*, *Ex. 16*.

36.     The decision makers artificially inflated the male candidates'

qualifications for the GSE Regional Contracts Manager position and diminished

Lampe's qualifications. *Ex. 7*, *Ex. 10*, *Ex. 15*, *Ex. 17*.

37.     For example, Lampe's resume clearly shows her 11 years' experience working for Delta as a mechanic which was consolidated to just "EPA/safety coordinator." *Ex. 7*, *Ex. 17*.

38.     Further comparing resumes to the matrix, the decision makers disregarded Lampe's frontline leadership experience and ignored her experience in fleet management and other skills. *Ex. 7*, *Ex. 17*, *Ex. 34*, *Ex. 57*, *Remillard Depo. 5:1-12*.

39.     Simultaneous to diminishing Lampe's qualifications, the decision makers inflated the male candidates' qualifications and added content that was not listed on their resumes. *Ex. 7*, *Ex. 10*, *Ex. 17*.

40.     For example, Schulte was given credit for being a GSE Liaison-which position was not on his resume-and the position does not exist within Delta at the Salt Lake City airport and entered data saying Schulte had 3-6 years previous GSE experience-which is not found on his resume. *Ex. 7*, *Ex. 10*, *Ex. 15*, *Ex. 17*, *Ex. 55*, *Maier depo. 27:10- 28:3; 109:8-13*.

41.     The decision makers assigned Lampe lower scores than male candidates which scores were not associated with experience. *Ex. 17*.

42.     One example being that according to his resume, Schulte did not meet the minimum requirements of the job and should not have been permitted to

interview. *Ex. 10*, *Ex. 14.*

43.     The decision makers assigned also assigned Schulte a rating equal to Lampe for "technical fit" even though he had no technical experience in GSE and Lampe, at the time, had 11 years of technical experience in GSE. *Ex. 7*, *Ex. 10*, *Ex. 11*, *Ex. 18*, *Ex. 55*, *Maier Depo. 50:5-14*.

44.     In addition to assigning Schulte technical experience that he did not have, the decision makers rated Schulte as a higher "cultural fit" than Lampe.  *Ex. 7*, *Ex. 10*, *Maier Depo. 50:15-24*, *Remillard Depo. 5:1-12*.

45.     When asked why Schulte ranked higher than Lampe as a cultural ft, Maier said . . . "[s]o from an ability to communicate, he came across a lot better." *Ex. 7*, *Ex. 10*, *Maier Depo. 50:15-24*, *Remillard Depo. 5:1-12*.

46.     Maier offered Schulte the position over Lampe ignoring the fact that Lampe's experience exceeded the job qualifications and Schulte did not meet the minimum requirements of the job, disregarding the fact that Schulte lacked knowledge of Ground Support Equipment maintenance functions, GSE technical experience, and the preferred educational qualifications. *Ex.7*, *Ex. 10*, *Ex. 14*, *Ex. 18*.

47.     In March 2021, Delta posted a LGMT position. *Ex. 19*.

48.     According to the Lead GMT job posting, candidates "must achieve a

satisfactory score on entry tests structured to determine ability to perform required tasks." *Ex. 19*, *Ex. 20*, *Ex. 55*, *Maier Depo. 68:24-69:2*; *15:24-16:13*.

49.     Lampe was required to take a BMARS qualifying test that the decision makers did not require the male candidates to take.  *Ex.20, Ex. 22*, *Ex. 29*, *Ex. 44*.

50.     Lampe's education and experience exceeded the job qualifications and she applied for the position. *Ex. 19*,  *Ex. 21*.

51.     Woodard, Lampe's supervisor, told Maier that Lampe had applied for the LGMT position and Maier sent Woodard a matrix to use to help decide who to hire. *Ex. 23*, *Ex. 24*.

52.     Here, like with the Regional Contracts Manager position, the decision makers embellished the male candidates' credentials and diminished Lampe's credentials. *Ex. 21*, *Ex. 24*, *Ex. 25*, *Ex. 26*.

53.     For example, in the "final score column" the decision makers ranked Dickinson as having "strong GMT knowledge" which is not on Dickinson's resume and lists Lampe as "weak on specialized" which is contrary to Lampe's resume.  *Ex. 21*, *Ex. 24*, *Ex. 25*, *Ex. 26*, *Ex. 54*, *Woodard Depo. 18:6-24*.

54.     Shortly after Woodard returned the matrix to Maier, Maier instructed Woodard to use a different matrix. *Ex. 27*.

55.     On the second matrix, Woodard, without explanation, rescored

Dickinson's "leadership and specialized" scores from a three to five-but Dickinson's resume does not mention any experience with specialized equipment. *Ex. 25.*

56.     Woodard re-scored Dickinson's "electrical" scores from one to five-although Dickinson's resume does not mention any electrical experience. *Ex. 25.*

57.     Woodard re-scored Dickinson's hydraulic score from a two to a five-but Dickinson's resume does not mention any hydraulic experience.  *Ex. 25.*

58.     Woodard rescored and gave Dickinson a "5" in welding-even though welding was not listed on Dickinson's resume, Dickinson was not certified to weld, and welding was not a requirement for the position. *Ex. 19*, *Ex. 28*, *Ex. 47*, *Ex. 55*, *Maier Depo. 106:19-25.*

59.     Maier, without knowing anything about Lampe's qualifications, discouraged Woodard from promoting her saying it would be "a leap" for her to be LGMT "*this early in her progression*" although at that point, Lampe had worked in GSE for nearly 12 years compared to Dickinson's nine years and Leyba's eight years in GSE. *Ex. 28*, *Ex. 46.*

60.     Maier said he based his opinion that Lampe was not qualified for the LGMT position "just by the nature of the job description and the scope of work that they're expected to do" but had no personal knowledge of Lampe's skills,

education, and abilities. *Ex. 55, Maier Depo. 63:15-64:10; 101:1-102:8*.

61.     Woodard and Maier overed the LGMT position to Dickinson in

March 2021. *Ex. 53*.

62.     When asked if he knew why Lampe wasn't chosen for the March

2021 LGMT position, Woodard said:

> A: Yes, she was not the best qualified candidate.
>
> Q: Okay, and was that based off on lack of experience with specialized equipment?
>
> A: Yes.
>
> Q: Was that the only reason?
>
> A: Yes.
>
> *Ex. 54, Woodard Depo. 16:13-24*.

63.     However, specialized equipment experience was not a minimum or

preferred requirement of the Lead GMT position and neither Woodard nor Maier

knew how much training Lampe had with specialized equipment and said there "is

no way to quantify the experience." *Ex. 55, Maier Depo. 82:17-83:3; 84:13-85:6*.

64.     Dickinson stepped down from the LGMT position a couple of months

after he was promoted. *Lampe Decl.¶11*.

65.     In July 2021, Delta posted another position for LGMT to fill the spot

Dickinson vacated. *Ex. 31, Ex. 30*.

66.     The minimum qualifications specified in the July 2021 posting position were the same as in March 2021.  And again, Lampe applied for the position because her education and experience exceeded the job qualifications. *Ex. 4*.

67.     The decision makers invited Lampe, James Belcher (Belcher) Jason Brentzel (Brentzel), and Diego Lurati (Lurati) to interview for the July 2021 LGMT position, although Lampe was the only candidate with a BMAR score on file. *Ex. 20*, *Ex. 32*.

68.     Woodard said Lampe was not the best candidate for the August 2021 LGMT promotion because "the best candidate had more MIC duties, which are leadership roles daily out on the floor, controlling as a Lead GMT would.  He had better experience in his outside-of Delta experience in equipment and vehicles." However, Lampe's outside leadership, technical, and automotive experience was discounted, as was her leadership and technical experience within Delta. *Ex. 54, Woodard Depo. 37:10-21*.

69.     Woodard gave the LGMT position to Belcher. *Lampe Decl.¶12*.

70.     Comparing resumes to the posted job description and requirements listed by decision makers, Belcher's resume lists no experience with specialized equipment, welding, or MIC. His resume outlines no leadership responsibilities.

Lampe's resume lists experience as an MIC, with electrical, hydraulic, automotive systems, and multiple leadership positions and responsibilities. *Ex. 4, Ex. 33*.

71.     If the decision makers promoted Lampe as GSE Department Manager in 2020 her salary would have gone from $58,801 to $161,000 and her 401K contribution, as 20% of her wages, would have been: $32,200. *Lampe Decl.¶13, Ex. 36, Ex. 37, Ex. 39, Ex. 40, Ex. 42*.

72.     If Lampe had been promoted to GSE Regional Contracts Manager in 2020, her salary would have gone from $58,801  to $161,000 and her 401K contribution, as 20% of her wages, would have been: $32,200 *Lampe Decl.¶14, Ex. 36, Ex. 37, Ex. 39, Ex. 40, Ex. 42*.

73.     If Lampe had been promoted to LGMT in March 2021 or August 2021, her salary would have gone from $68,791 to $99,049 and the difference to her 401K contribution, as 20% of her wages, would have been: $6,475. *Lampe Decl.¶15, Ex. 36, Ex. 37, Ex. 39, Ex. 40, Ex. 42*.

## **ARGUMENT**

Delta has allowed its interviewing and hiring decision makers to rank candidates for promotion using practices dictated by discriminatory animus.

The undisputed material facts show Lampe has established a prima facie claim for sex discrimination.  Lampe is a member of a protected class.  Lampe

applied for promotions for which she was well qualified.  Delta rejected Lampe and hired male candidates under circumstances that give rise to inferences of discrimination.

Delta's stated reasons for rejecting Lampe include blanket statements such as "she was not the most qualified" and "the interview process did not hire her." Those statements are pretext.  In the situations described in the statement of facts above, Lampe was the most qualified candidate for the positions.  Woodard was hired as the GSE Manager even though his seniority should have excluded him from consideration.  Schulte was hired as the GSE Regional Contracts Manager even though he did not meet the minimum job qualifications.  Dickinson and Belcher were hired as LGMTs even though they did not have a BMAR on record and they did not meet other criteria for the position.

Accordingly, the Court should grant Lampe's motion for partial summary judgment as a matter of law.

### A.      Title VII, Direct Evidence and McDonnell Douglas Standard

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2012).
*Drescher v. Clinton City,* 2017 U.S. Dist. LEXIS 34980, *9.

Failure to promote claims under Title VII follow the burden-shifting framework established under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Thuc Tran v. Sonic Indus. Servs.*, 490 Fed. Appx. 115, 118 (10th Cir. 2012) (applying the *McDonnell Douglas* burden-shifting framework to a failure to promote claim under Title VII).

For a plaintiff to establish a prima facie case for failure to promote, the plaintiff must demonstrate "(1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled by someone outside the protected class." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005).  *Drescher*, 2017 U.S. Dist. LEXIS 34980 at *11-12.

This framework requires asking three questions in this order: (1) has the plaintiff established a prima facie case of discrimination; (2) has the defendant offered a legitimate, nondiscriminatory reason for the employment action; and (3) assuming the defendant has offered such a reason, can the plaintiff produce evidence that the stated reason is a mere pretext for discriminatory intent. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).

Courts have held that the burden on both parties in the first two steps is relatively mild. *E.g., Orr v. City of Albuquerque*, 417 F.3d 1144, 1152 (10th Cir. 2005) (noting that the prima facie case is "not onerous").  Lampe has met this initial burden of establishing a prima facie case.

Establishing the prima facia case "creates a presumption that the employer unlawfully discriminated against the employee." *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1223 (10th Cir. 2003) (internal quotation marks omitted) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).  *Lee-Fanning v. Chao*, 2019 U.S. Dist. LEXIS 3286, *6

The Defendant's burden on the second step is one of production, not persuasion, and Courts have characterized this burden as "exceedingly light." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011)).

To negate this discriminatory presumption, "the burden shift[s] to the employer to articulate 'some legitimate, nondiscriminatory reason' for the questioned action." *Nulf*, 656 F.2d at 558 (citing *McDonnell Douglas*, 411 U.S. at 802).  Here, Delta's stated legitimate nondiscriminatory reason for rejecting Lampe is "she was not the most qualified" and "the interview process did not choose her."

Delta's stated reasons for refusing to promote Lampe are pretext.  "Evidence

of pretext may include, but is not limited to, the following: prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (*e.g.*, falsifying or manipulating hiring criteria); and the use of subjective criteria." *Simms*, 165 F.3d at 1328 (citing *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984), *cert. denied*, 469 U.S. 855, 105 S. Ct. 181, 83 L. Ed. 2d 115 (1984)).

Delta's proffered reason for not promoting Lampe is pretext.  "To establish pretext a plaintiff must show either that 'a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence.'" *Bullington v. United Airlines Inc.*, 186 F.3d 1301, 1317 (10th Cir. 1999) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)), *implicitly overruled on other grounds as recognized by Boyer v. Cordant Techs.*, 316 F.3d 1137, 1140 (10th Cir. 2003).

Delta's decision makers used subjective decision making, which creates a strong inference of discrimination. *Turner v. Public Serv. Co.,* 563 F.3d 1136, 1140. Delta decision makers have no legitimate excuse for inflating the male candidates' qualifications and diminishing Lampe's qualifications.  Delta decision makers have no legitimate excuse for hiring male candidates who did not meet the

minimum job qualifications.  This subjective decision making shows the strong inference of Delta's discrimination.  See <u>Sotunde v. Safeway, Inc., 716 Fed. Appx. 758, 760.</u> ("[w]hile it is an employer's understanding of an employee's qualifications that counts, a reasonable inference that a successful candidate's qualifications were unreasonably inflated, while a plaintiff's w ere unreasonably denigrated, is relevant to a pretext inquiry."

For evidence of an employer's alleged general bias to be pertinent in a Title VII claim, the Court of Appeals requires some connection or logical nexus between a showing of general bias and a particular employment decision; the general bias must play a direct role in the adverse employment decision in the plaintiff's case. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq. Id.  The general bias of Delta's decision makers played a direct role in rejecting Lampe for promotion.  Turner v. Public Serv. Co., 563 F.3d 1136, 1140.

## CONCLUSION

Based on the uncontroverted evidence, Lampe applied for positions for which she was well qualified.   Delta's decision makers hired male candidates that did not meet minimum requirements of some positions.  Delta's decision makers asked Lampe different questions than the male candidates.  Delta's decision makers artificially inflated male candidates' qualifications and diminished

Lampe's qualifications.  For all the foregoing reasons, Lampe's motion for partial summary judgment should be granted.

Respectfully submitted this 17th day of April 2023.

ANDERSON-WEST LAW

 /s/ Michele Anderson-West
Michele Anderson-West

**CERTIFICATION**

I, Michele Anderson-West, certify that MOTION FOR PARTIAL

SUMMARY JUDGMENT contains 4378 words and complies with DUCivR 7-

1(a)(4).

            /s/ Michele Anderson-West    `

## CERTIFICATE OF SERVICE

I certify that on the 17th day of April 2023 I filed a true and correct copy of

the foregoing PLAINTIFF'S MOTION FOR PARTIAL SUMMARY

JUDGMENT through the Court's ECF which sent notice to:

ddibble@rqn.com

rthaler@rqn.com

/s/ Michele Anderson-West