Michele Anderson-West (9249)
**ANDERSON-WEST LAW**
9980 South 300 West, Suite 200
Sandy, Utah 84070
Telephone: 801.830.1958
Email: michele@andersonwestlaw.com

*Attorney for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLAIR LAMPE, an individual,<br><br>   Plaintiff,<br><br>v.<br><br>DELTA AIR LINES, INC., a foreign corporation,<br><br>   Defendant. | **OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY**<br><br>**Case No. 2:22-cv-00055-TC**<br><br>**Honorable Tena Campbell** |

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and DUCivR 2-1 and 56-1, Plaintiff Blair Lampe ("Lampe"), by and through her undersigned counsel, respectfully submits her opposition to Defendant Delta Air Lines', Inc.'s ("Delta") Motion for Summary Judgment ("MSJ").

## INTRODUCTION AND RELIEF SOUGHT

Delta argues that it is "firmly committed to a policy of equal employment opportunity, non-discrimination and non-retaliation" which is stated in its publications The Way We Fly, Code of Ethics and Business Conduct manuals. (Ex. 67 and Ex. 68). Delta's non-discrimination policy was readily accessible to all employees including Lampe. MSJ, p. 5). Lampe relied on Delta's non-discrimination policy and when faced with discrimination, reported the misconduct to HR.  However, Delta did not take Lampe's allegations seriously, failed to follow its SOP as to Discrimination investigations.

1

If Delta had taken Lampe's legitimate complaints, she brought to HR seriously in 2018, and investigated as described in Delta's SOP, perhaps she would not have had to file this complaint.  If Delta had taken Lampe's complaints, she brought to HR seriously in 2019, and investigated as described in Delta's SOP, she would not have had to file the complaint.  If Delta had taken Lampe's complaints, she brought to HR seriously in 2020, Lampe would not have had to file this complaint.

Based on the foregoing, and the following facts and legal authority, Lampe respectfully asks the Court to deny Delta's MSJ.

<u>**BACKGROUND  FACTS**</u>

Delta hired Lampe in June 2009 to work in its GSE department, as a Ground Maintenance Mechanic (GMM) at JFK International Airport in New York.  In August or September 2010, Lampe had a once of a lifetime opportunity to work on a humanitarian project in rural India, where she developed and managed the maintenance operations for a vehicle fleet used by Doctors Without Borders.  (Ex. 63 at 31:11-19, Ex. 63 at 36:18-25)**.**

During her year in India, Lampe supervised and managed approximately 21 individuals, provided oversight and training to local staff, created automotive repair and maintenance training, established a vehicle maintenance program and workshop. (Ex. 4).

Lampe further used her technical and mechanical experience between when she worked as a technical writer for the automotive field writing hundreds of articles pertaining to various mechanical and technical topics. (Ex. 4, Ex. 63 *Lampe Depo*. 27:11-17. 29:16-18, Ex. 64).

The pending matter is the second complaint Lampe has filed against Delta.  Lampe filed a complaint in May 2020 which was dismissed on Delta's 12(b)(6) motion due to much of the

2

allegations having occurred prior to 300 days of Lampe filing her Charge of Discrimination. Contrary to Delta's statements, that complaint was not meritless-nor did the Court address its merits. (ECF 63).

<u>**RESPONSE TO DELTA'S STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

1.      There are various positions within Delta's GSE department, including Ground Maintenance Mechanics ("GMM"), Ground Maintenance Technicians ("GMT"), and Lead Ground Maintenance Technicians ("Lead GMT").  (Ex. 2 at 68:8-25, 77:13-17; *see also* Standard Operating Procedure for GSE Hiring ("GSE SOP"), PLAINTIFF 00083, attached as Exhibit 6 to Appendix.)

**<u>UNDISPUTED BUT INCOMPLETE</u>.**

**In addition to the positions Delta identified above, GSE includes roles such as department managers, regional contract managers, specialists, analysts, and others. These are not listed in the standard operating procedure for GSE hiring. (Ex. 1, Ex. 2, Ex. 3).**

2.      The GMM "performs as a semi-skilled mechanic in maintenance of Ground Support Equipment (GSE)." (GMM Job Description, attached as Exhibit 7 to Appendix; *see also* Ex. 2 at 86:17-22.)   The GMM "may also assist a Ground Maintenance Technician Lead or a Ground Maintenance Technician on equipment when needed." (Ex.7; *see also* Ex. 2 at 87:2-11; Ex. 3 at 7:16-9:3; Deposition of Fred Woodard ("Woodard Depo."), 13:11-23, attached as Exhibit 8 to Appendix.)  The GMM does not have any direct reports and is not a supervisory position. (Ex. 2 at 86:12-16.) The GMM is "responsible for utilizing appropriate tooling, equipment and material to accomplish minor maintenance functions including but not limited to

the following: inspections, minor troubleshooting, repairing, removing and replacing components on all Ground Support equipment." *(Id.* at 87:14-22; *see also* Ex. 7.)

**UNDISPUTED BUT INCOMPLETE.**

**Lampe, as GMM performed supervisory functions in her role as Safety and Environmental Coordinator such as schedule management of both GMMs, GMTs, and Lead GMTs to accommodate shop inspections and compliance programs. Furthermore, in her role as Safety and Compliance coordinator, she no longer fell under Lead GMTs in the GSE supervisory hierarchical structure, instead reporting directly to her manager, as a Lead GMT position would. (Ex. 62 at 3-11, Ex. 5, Ex. 7, Ex. 8).**

**In addition to the description loosely stated by Woodard, Lampe's former supervisor while working at SLC International Airport, Lampe was also assigned Ground Maintenance Technician (GMT) work on a regular basis without any oversight. Lampe's longevity with Delta as a GMM (prior to her promotion) and her regular work on specialized equipment was one of the skills that made her qualified for the promotions for which she was passed over. (Ex. 63 at 89:2-92:5, Ex. 63 at 93:15-96:18, Ex. 58 at 31:18-32:16, Ex. 58 at 33:7-15, Ex. 60 at 7:20- 8:20, Ex. 60 at 30:6-10, Ex. 6, Ex. 4, Ex. 12, Ex. 46, Ex. 38).**

3.      A GMT is an advanced mechanic who typically works on specialized equipment. (Ex. 2 at 89:19-22.)  There is not an automatic progression from GMM to GMT, meaning, a GMM does not automatically progress to become a GMT with the passage of time.  *(See id.* at 92:18-93:4; *see also* Ex. 3 at 10:9-11:1;  Ex. 6 at PLAINTIFF  00085.)

**UNDISPUTED.**

4.      A Lead GMT supervises the daily operations and workflow of GSE mechanics and maintenance on equipment.  (Ex. 2 at 152:4-12; *see also* Ex. 8 at 12:24-13: 10.)   A Lead GMT must also have a thorough theoretical and working knowledge of motorized Ground Support Equipment and must have the ability to perform as the working Leader of groups of GMTs and GMMs.  *(See* Lead GMT Job Description, attached as Exhibit 9 to Appendix; *see also* Ex. 2 at 152:4-153:9; Ex. 8 at 12:24-13:10.)

**UNDISPUTED BUT INCOMPLETE.**

**While a Lead GMT is described as supervising the daily operations of GSE mechanics and maintenance, Leads are not considered "supervisors" by Delta. Additionally, although a Lead GMT is said to require a thorough theoretical and working knowledge of motorized Ground Support Equipment, in practice, the majority of Lead GMTs primarily delegate tasks to knowledgeable team members and coordinate operational logistics, without performing maintenance work themselves.**

**Data shows on average GMTs in Salt Lake worked on Specialized equipment 29% of the time in 2021, while GMMs held an average rate of 21%, often working independently. Furthermore, matrix ranking categories show Technician Length of Service (TLOS) has been a significant factor in promotion decisions. Yet- the average TLOS of all eight male GMMs promoted to GMT from Salt Lake City since 2020 is 1.6 years, while Lampe had a TLOS of 12 years at the time of her promotion. This discrepancy, along with instances of**

**male GMMs promoted with as little as six months of GSE experience, is**

**indicative as to Delta's discriminatory practices in making promotion decisions.**

**(Ex. 63 at. 89:2-92:5, Ex. 63 at 93:15-96:18, Ex. 58 at 31:18-32:16, Ex. 58 at 33:7-15, Ex.**

**60 at 7:20- 8:20, Ex. 60 at 30:6-10, Ex. 13, Ex. 14, Ex. 16, Ex. 17, Ex. 18, Ex. 46).**

**( Ex. 61 at 44:17-22, 46:6-11,25, Ex. 61 at 47:1-11, Ex. 59 at 20:24-25, 21:1-12, Ex.**

**58 at 33:7-15, Ex. 58 at 31:18-32:16).**

5.      GMMs, GMTs, and Lead GMTs are paid according to defined, gender-neutral

pay scales that vary by position and increase with seniority.  *(See* Ex. 2 at 100:12-102:21,

104:1- 105:17; *see also* Pay Scales, attached as Exhibit 10 to Appendix.)

**<u>DISPUTED IN PART</u>.**

**The pay scale as written is gender neutral to the extent there is nothing**

**written indicating one pay scale for men and one pay scale for women.**

**Notwithstanding, because pay scales vary with position and seniority,**

**Delta's pay scale is not gender neutral when discrimination manifests**

**through hiring and promotion.  For example, as is one of the issues here,**

**Lampe was promoted from GMM to GMT in 2021 after working for Delta**

**for 12 years.  On the other hand, C.B. was just promoted from GMM to**

**GMT after working for Delta for less than one year.  J.T. was just promoted**

**from GMM to GMT after working for Delta for less than three years. The**

**first female promotion from GMM to GMT only occurred in 2021, despite**

**numerous female GMMs in the department prior.  (Ex. 58 at 56:5-16, Ex. 8,**

**Ex. 20, Ex 38)**

6

6.      GSE employees may express interest in and apply for various collateral duties. *(See* Ex. 2 at 93:15-96:4.)  But such collateral duties do not change the overall position held by the GSE employee, and there is no change in pay rate associated with participation in collateral duties. *(Id.* at 97:23-99:1.)

**DISPUTED IN PART.**

**Lampe does not dispute an employee may express interest and apply for various collateral duties. GMTs receive premium pay for things such as welding, refrigeration pay, and holding ASE certifications, among other available premiums. Lead GMTs receive Lead premiums. In other areas of Airport Customer Service ("ACS", the larger corporate division under which GSE falls), "specialty agents" performing Training Coordinator (Learning Records Administrator) and Ground Safety Advocate duties were compensated an hourly override of $2.00 per hour.  In these instances, employees took on roles through an Expression of Interest, as Lampe had done.  (Ex. 63 at 187:24-188:12, Ex. 62 at 16:3-11, Ex. 8, Ex. 10, Ex. 11, Ex. 5, E. 21)**

7.      Plaintiff voluntarily applied for various collateral duties.  At one point, for example, she acted as a Step-In Ambassador.  (Ex. 2 at 149:4-150:14.)  Later, she acted as a Training Coordinator, and eventually she became an Environmental & Safety Coordinator. *(Id.* at 94:23-95:12; *see also* Ex. 8 at 14:21-15:8.)  During those times, however, her position did not change, and she remained a GMM.  (Ex. 63 at 187:24-188:12, Ex. 62 at 16:3-11, Ex. 5, Ex. 21, Ex. 8, Ex. 10, Ex. 11)

**UNDISPUTED BUT INCOMPLETE.**

**Lampe's "title" as GMM did not change, but her responsibilities did change. Specifically, Delta requested Lampe to assume the role of Training Coordinator in 2019, and again in 2020, altering her responsibilities from primarily technical maintenance to include coordination of safety and environmental compliance. Her reporting structure also changed, reporting directly to the Salt Lake GSE Manager and periodically to the Safety and Compliance Manager in Atlanta. Thus, although her official position remained unchanged, the nature of her role significantly differed from that of her previous work.** (Ex. 63 at 187:24-188:12, Ex. 62 at 16:3-11, Ex. 5, Ex. 21, Ex. 8, Ex. 10, Ex. 11.)

8.      Accordingly, when Plaintiff had collateral duties, she was still paid pursuant to the GMM pay scale, as were other GMMs with collateral duties - for example, the male GMM who succeeded Plaintiff as the Environmental & Safety Coordinator was also paid according to the GMM scale, which incidentally meant that he earned less than Plaintiff who was paid at the top end of the pay scale. (Ex. 2 at 97:23-99:1; 99:10-101:15.)

**DISPUTED IN PART.**

**Lampe had already 11 years of experience as a mechanic in GSE, yet when she accepted the role, she was told she required further specialized experience to attain a GMT promotion and continued to perform occasional maintenance and repairs in addition to Coordinator duties.  Her predecessor, who had two years in GSE when he took on the role, was not required to perform equipment maintenance and repairs while in the coordinator role and was promoted to a GMT position based**

**on the merits of the coordinator position alone one year later, continuing the role as a GMT.   (Ex. 2 at 97:23-99:1; 99:10-101:15.)**

9.      Delta follows a standard operating procedure for GSE department hiring and promotions.  *(See* Ex. 6 at PLAINTIFF 00083; *see also* Ex. 2 at 67:20-68:12; Deposition of Mike Maier ("Maier Depo."), 57:22-59:11, attached as Exhibit 11 to the Appendix.)

**<u>DISPUTED</u>.**

**Delta has no Standard Operating Procedure for merit (salaried) position hiring and promotions within GSE. The GSE Hiring SOP pertains only to scale (hourly) employees, and in those instances, it was not followed. For example: in the GMT promotional process, multiple male GMMs were allowed to schedule and complete interviews, despite not having previously passed the BMARS aptitude test, where Lampe was required. The ranking process based on listed attributes was also not followed. In the Lead GMT promotional process, male candidates were never required to take the BMARS. As GMTs, they were presumed to have taken previous aptitude tests (although Delta's records are not clear according to General Managers) and they were allowed to bypass the BMARS, although Lampe had also taken and passed those same previous aptitude tests multiple times. (Ex. 58 at 16:4-13, Ex. 59 at 33:4-34:8, Ex. 58 at 96:4-97:14, Ex. 63 at 187:24-188:12, Ex. 58 at 16:4-13, Ex. 1, Ex. 23, Ex. 25, Ex. 26, Ex. 27, Ex. 14.)**

10.      For example, under the GSE SOP, the process for hiring a Lead GMT starts with Delta reviewing and recalling any furloughed employees, if applicable.  *(See* Ex. 6 at PLAINTIFF 00086; *see also* Ex. 2 at 77:13-21.)  Then, Delta alternates between promoting

internal candidates and approving the transfers of Lead GMTs from other Delta locations.  (Ex. 6 at PLAINTIFF 00086; *see also* Ex. 2 at 77:22-25.)

**UNDISPUTED BUT INCOMPLETE.**

**Continued reading of the SOP reveals the interview process should "consist of a fit interview guide consisting of questions "Leading others" that display the candidates understanding of the position to which they are applying. In addition to this guide, Lead GMT candidates are asked additional, non-standard questions not relevant to Leading others. (Ex. 58 at 16:4-13, Ex. 1, Ex. 23.)**

11.     With respect to internal promotions to a Lead GMT position, Delta ranks and interviews candidates to determine which individual is the most qualified to fill a particular position.  (Ex. 6 at PLAINTIFF 00086.)

**DISPUTED IN PART.**

**Delta does not follow its own standardized procedure and ranks and interviews candidates based on subjective criteria.  Decision makers did not use the ranking process or criteria outlined in the hiring SOP.   For example, Lampe in 12 years did not receive a yearly career discussion. . . .and hired individuals who happen to all be male alleging they were the most qualified.  Delta did not hire the most qualified individuals.  (Ex. 59 at 33:4-34:8, Ex. 58 at 96:4-97:14, Ex. 63 at 187:24-188:12, Ex. 58 at 106:19-25, Ex. 58 at 82:5-85:6, Ex. 58 at 63:15-64:10, Ex. 58 at 101:11-102:8, Ex. 58 at 72:20-73:23, Ex. 1, Ex. 22, Ex. 16, Ex. 4, Ex. 31, Ex. 57, Ex. 46, Ex. 19.)**

12.     For purposes of determining who to interview, Delta ranks applicants using various criteria, including safety, reliability, productivity, quality, aptitude/professionalism, job knowledge, equipment experience and proficiencies, education and certifications, computer skills, and Leadership experience.  (Ex. 6 at PLAINTIFF 00086; *see also* Ex. 2 at 78:9-21; Ex. 8 at 18:6-19:4.)

**DISPUTED.**

**Delta GSE's ranking process deviated from the criteria listed in the GSE Hiring SOP when considering Lampe's candidacy. For instance, in Lampe's March 2021 Lead GMT interview, the General Manager Maier provided a matrix with categories like Seniority, Leadership, Automotive, Heavy/Specialized Equipment, Electrical, Hydraulic, and Welding. Furthermore, Maier encouraged the Department Manager of Salt Lake to change the ranking process to get a different result, specifically questioning Lampe's high score. Similarly, When Lampe was scored for two GMT positions in 2017 by the same decision-maker as a 2021 Lead interview, her scores varied significantly within a three-month period, further indicating inconsistencies in the ranking process.  (Ex. 59 at 5:19-6:23, Ex. 58 at 106:19-25, Ex. 63 at 173:24-175:11, Ex. 1, Ex. 25, Ex. 15, Ex. 16, Ex. 57, Ex. 18, Ex. 52.)**

13.     Delta's interview process for Lead GMT positions consists of a "FIT Interview Guide" consisting of questions "that display the candidates ['] understanding of the position to which they are applying."  (Ex. 6 at PLAINTIFF 00086; *see also* Ex. 2 at 78:22-79:3; FIT Interview Guide, attached as Exhibit 12 to Appendix.)  Delta uses the FIT Interview Guide to make "evaluations as fair and accurate as possible." (Ex. 12 at DLT_LAMPE_00000676.)  Delta

uses the same set of questions for each candidate for each opening.  (Ex. 8 at 11:24-12:8; Ex. 11 at 45:24-46:3.)

**DISPUTED.**

**The FIT Interview Guide attached as Delta's Exhibit 12 is not the correct version according to the GSE Hiring SOP. The correct guide for Lead GMT promotions is "Leading Others", not "Leading Self". Additionally, Lampe's interview did not "consist of" questions from the FIT guide. It included extra questions introduced by the decision makers, contrary to the SOP. Furthermore, one manager labeled Lampe as "weak" during the interview, a clear violation of FIT guide instructions. Decision maker Remillard does not recall using the FIT guide at all during Lampe's Lead GMT bid in March 2021, and struggles to explain its purpose, which raises questions about the consistency and fairness of the interview process.  (Ex. 60 at 5:25-6:22, Ex. 60 at 36:1-38:7, Ex. 1, Ex. 24, Ex. 23, Ex. 33, Ex. 28, Ex. 29.)**

14.     GMTs are required to take and pass the Basic Mechanical Aptitude and Reasoning ("BMAR") test unless they've already passed a prior version of the test or were otherwise grandfathered out of the requirement given their seniority.  (Ex. 2 at 160:24-161:20.) A candidate for a Lead GMT position must pass the BMAR test if they have not already passed it. (Ex. 2 at 162:16-163:2; *see also* Ex. 8 at 27:16-28:5; Ex. 6 at PLAINTIFF 00085.)

**DISPUTED.**

**There is no such Delta policy. The GSE SOP states that for Lead GMT positions, openings shall be filled by ranking, testing, interviewing, and hiring non-Lead GMT candidates…including GMT promotions" the Lead GMT job**

**description states candidates must "achieve a satisfactory score on entry tests structured to determine ability to perform required tasks." Additionally, due to departmental restructuring in the mid-2000s, there are many (exclusively male) GMTs who have never passed such an aptitude test and would not be required to take the BMARS for a promotion. Further, Delta admits its records for these test scores are not reliable. Further, Lampe had taken and passed the same prior version of the test multiple times in previous bids for promotions. (Ex. 58 at15:24-16:17, Ex. 63 at 158:1-161:2, Ex. 1, Ex. 24, Ex. 23.)**

15.     Finally, based upon the interviews, GSE management selects the most qualified candidate for the open Lead GMT position (as it does for all open positions). (Ex. 6 at PLAINTIFF 00086.)

**DISPUTED**.

16.     In October 2020 while she was a GMM, Plaintiff applied for a Department Manager, Ground Support Equipment position (the "Department Manager")- a position multiple levels above the entry-level GMM position. (Ex. 2 at 123:7-11; *see also* Department Manager Application Email, attached as Exhibit 13 to the Appendix.).

**DISPUTED IN PART**.

**Lampe does not dispute she applied for the position.  However, Delta has no stated hierarchy of roles in GSE spanning from scale to merit. (Ex. 4, Ex. 33).**

17.     The Department Manager supervised all GMM, GMT, and Lead GMT positions stationed in Salt Lake City and was responsible for the "safe, compliant, and economical performance of all GSE functions" at that location. (Ex. 2 at 124:13-125:17; *see also* Department Manager Job Description, attached as Exhibit 14 to the Appendix.)

**UNDISPUTED**.

18.      Delta "strongly preferred" "frontline supervisor experience and GSE experience"

for the Department Manager.  (Ex. 14 at PLAINTIFF 00082; *see also* Ex. 2 at 126:20-22.)

**DISPUTED BUT INCOMPLETE**.

**Lampe does not dispute the language in the job posting, however, Delta omits**

**the requirement that Delta merit employees must have been employed by Delta**

**for at least 12 months to apply for new roles.  In this regard, Woodard did not**

**meet the minimum requirements for the opening as he had less than one year**

**of Delta GSE experience while Lampe had over 11.  (Ex. 36, Ex. 4, Ex. 20)**

19.      At the time, Plaintiff had been neither a GMT nor a Lead GMT, yet she was

applying for a job that would have been responsible for managing them all.  (Ex. 2 at 126:5-15.)

**UNDISPUTED BUT INCOMPLETE**.

**Fred Woodard, the male who received the promotion, had been neither a GMT**

**nor a Lead GMT, yet he applied for and was given the promotion. While**

**Lampe was not even selected for an interview.  Lampe, at the time had worked**

**at Delta GSE for 11 years compared to Woodard's less than one year. (Ex. 63**

**at 20:6-22:25, Ex. 63 at 41:10-15, Ex. 63 at 31:11-19, Ex. 37, Ex. 4.)**

20.      Ultimately, Plaintiff was not selected for the Department Manager position

because Delta concluded that she was not the most qualified candidate for the position.  (Ex. 2 at

127:16-21; Ex. 11 at 35:5-20.).

**UNDISPUTED BUT INCOMPLETE**.

**Lampe was not selected for the Department Manager position because she was**

**not permitted to interview for the position.  Lampe does not dispute Delta *said* it**

**determined that she was not the most qualified candidate for the position. Lampe does dispute the genuineness of that repeated and rehearsed legitimate non-discriminatory business reason given by Delta. For example, that statement "determined she was not the most qualified" has been used so frequently that here, Lampe was alleged not the most qualified for a position for which she was never interviewed. (Ex. 58 at 35:5-15, Ex. 41)**

21.     The candidate selected for the Department Manager position, Fred Woodard, had previously been a Department Manager for Delta at the JFK airport in New York City. (Ex. 2 at 128:15-129:4; *see also* Woodard Resume, attached as Exhibit 15 to the Appendix.) Woodard had significant Leadership experience - supervising a team of 85 mechanics, technicians, and Leads; overseeing a large budget; managing invoices, overtime, parts, and labor documents and metrics. (Ex. 2 at 129:5-15; *see also* Ex. 15.) Woodard was also a Master Mechanic Craftsman and had previously worked as Flight Superintendent, Shop Manager, and Aerospace Ground Equipment Technician. (Ex. 2 at 129:24-130:5; *see also* Ex.15.)

**DISPUTED IN PART.**

**Lampe does not dispute that Woodard held the positions identified above. Yet, Lampe had significant supervisory and leadership positions, and had been in Delta GSE for 11 years compared to Woodard's less than 1 year in GSE. Notwithstanding, Lampe was not even selected for the interview. (Ex. 4, Ex. 20.)**

22.     Plaintiff does not dispute that she did not have Woodard's qualifications - she had, for example, never been a department manager, never supervised a large team of maintenance workers, and had never been responsible for overseeing a budget in the GSE department - all responsibilities of a Department Manager. (Ex. 2 at 131:1-9; *see also* Ex. 14.)

**UNDISPUTED BUT INCOMPLETE.**

**Lampe does not dispute her qualifications did not mirror those of Woodard. Lampe does not dispute she had not been a department manager and had not overseen a GSE budget. Lampe did have 11 years with Delta GSE compared to Woodard's less than 1 year, had experience building and managing a fleet maintenance shop and program in a rural location where previously there had been none. (Ex. 63 at 31:11- 37:22.) Further, Lampe had worked as a Mechanic in Charge for Delta in GSE and had supervised other large teams of workers in both technical and non-technical fields. (Ex. 63 at 20:6-22:25, Ex. 63 at 135:18-23, Ex. 4)**

23.     Plaintiff also applied for a Regional Manager of GSE Contracts (the "Regional Manager") in October 2020.  (Ex. 2 at 131:17-132:8.)

**UNDISPUTED.**

24.     The Regional Manager is responsible for overseeing regional outstations staffed by contractors.  (Ex. 2 at 132:12-20.).  For each outstation, the Regional Manager is responsible for reviewing, managing, and resolving technical and administrative issues in the GSE department at the outstation.  *(Id.* at 134:3-11; *see also* Regional Manager Job Description, PLAINTIFF 00063, attached as Exhibit 16 to the Appendix.)  The Regional Manager provides daily oversight of regional contractor maintenance activities, while working with all operational departments of the station to ensure that all facets of the operation are supported and to maintain equipment service levels.  (Ex. 2 at 134:12-18; *see also* Ex. 16 at PLAINTIFF 00063.)  The Regional Manager also develops strategic plans and monitors operating budgets and performance plans. (Ex. 2 at 134:19-23; *see also* Ex. 16 at PLAINTIFF 00063.)

**UNDISPUTED**.

25.     Plaintiff was not selected for the Regional Manager position because Delta concluded that she was not most qualified candidate for the position.  (Ex. 2 at 140:8-10; *see also* Ex. 11 at 26:1-27:25.)

**DISPUTED**.

**Lampe does not dispute Delta *said* it determined that she was not the most qualified candidate for the position.  Lampe does dispute the genuineness of that repeated and rehearsed legitimate non-discriminatory business reason given by Delta.  For example, that statement "determined she was not the most qualified" has been used so frequently that Maier told Lampe she did not get a position (for which she was never interviewed) because Delta "determined she was not the most qualified." (Ex. 58 at 35:5-15.)**

**Lampe's education and experience made her, on paper, the most qualified candidate for the position.  Delta, however, sidestepped its own policy to include a non-eligible male candidate through the application process, and assigned him higher scoring than Lampe and other female candidates with clear discrimination. Lampe was not selected for the Regional Contracts Manager position because Delta blindly allows for bias to guide decision making in the promotional process. (Ex. 63 at 138:8-19, Ex. 58 at 98:16-102:8, Ex. 58 at 109:11-25, Ex. 58 at 50:5-14, Ex. 61 at 68:23-25 Ex. 61 at 69:1-13, Ex. 4, Ex. 16, Ex. 43, Ex. 44)**

26.     The candidate selected for the Regional Manager position, Eric Schulte, had multiple years of front-line experience with Delta.  (Ex. 2 at 145:17-21; *see also* Schulte

Resume, attached as Exhibit 17 to Appendix; Ex. 11 at 26:9-27:25.)  He had previously been an

Operations Service Manager, served as a program manager on specialized equipment for Delta in

Seattle, Washington, worked as a liaison between Delta's Operations department and the GSE

department, and established specialized operations teams for Delta in Seattle, Washington.  (Ex.

2 at 143:10-145:1; *see also* Ex. 17; Ex. 11 at 26:9-27:25.)  Schulte also had experience with

optimizing Delta's performance in Seattle both financially and operationally.  (Ex. 2 at 145:12-

16; *see also* Ex. 17.)

**UNDISPUTED BUT INCOMPLETE.**

**Lampe does not dispute that Schulte worked as an operations service manager.
Lampe does dispute, however the designation of "specialized" as pertains to GSE
maintenance functions, not the Operations Services Manager position.
Furthermore, listed roles of program manager and liaison were part of his
operations service manager position. (Ex. 47) Lastly, Schulte's application
rankings were inflated after receiving credit as "GSE liaison" in Salt Lake City—
a position that did not exist and that he did not hold either in practice or on his
resume. Ex. (47, Ex. 43, Ex. 58 at 27:11-28:3)**

27.     Plaintiff acknowledges that, unlike Schulte, she has never been an Operations

Service Manager.  (Ex. 2 at 144:15-16.)   She also admits that she did not have experience with

oversight of contract maintenance workers for Delta, had never been responsible for Delta's

departmental operating budgets, and, other than a few hours when she temporarily filled in as a

mechanic in charge ("MIC") on a couple of shifts, she had no front-line supervisor experience.

*(Id.* at 134:24-136:23.)

**DISPUTED IN PART.**

**Lampe does not dispute that she has never been an Operations Service Manager. However, Lampe disputes the characterization that she only filled in as a MIC on a couple of shifts. Lampe did have experience with oversight of contract maintenance workers at Delta, and her time working as MIC was for full shifts. Further, Lampe had significant frontline supervisor experience outside of Delta. (Ex. 63 at 31:11-19, Ex. 63 at 36:18-25, Ex. 63 at 40:3-41:15, Ex. 63 at 22:12-25, Ex. 63 at 136:7-9, Ex. 58 at 27:11-28:3, Ex. 4, Ex. 47, Ex. 43)**

28.     Although she had never worked as a GMT, Plaintiff applied for a *Lead* GMT position in Salt Lake City in February 2021. (Ex. 2 at 151:8-20; *see also* Lead GMT Application, attached as Exhibit 18 to the Appendix.)

     **UNDISPUTED.**

29.     Among other things, the Lead GMT was responsible to "act as the working Lead er of a group of Motorized GMT's/GMM's, plan and layout work, [and] instruct and supervise the work of the group." (Ex. 2 at 153:3-9; *see also* Ex. 9 at PLAINTIFF 00055.) The Lead GMT job also requires the ability to work as a Lead er of a group of motorized GMTs. (Ex. 2 at 153:10- 15; *see also* Ex. 9 at PLAINTIFF 00056.) The Lead GMT needs a "thorough theoretical and hands on working knowledge of motorized ground support equipment and must have achieved a satisfactory score on the entry test." (Ex. 2 at 154:20-155:4.) It is important for the Lead GMT to have sufficient experience working on Delta's specialized equipment because they are tasked with providing direction, assistance, and oversight of GMTs and GMMs who perform work on Delta's specialized equipment. (Ex. 11 at 63:6-24; 69:5-70:3.)

**UNDISPUTED BUT INCOMPLETE.**

**Undisputed this was the listed requirement, however neither the theoretical, working knowledge, nor entry testing was measured from qualified or recorded candidate data. Existing available quantifiable data was not consulted. Lampe was held to a different standard than male candidates in her requirements to prove credentials.  Disputed as Delta GSE has more than 1500 models of equipment, and it is unreasonable for a Lead GMT to be familiar with all of it. In practice, many Lead GMTs rarely if ever work on equipment, and instead assigned employees with experience on a singular equipment type to assist or provide direction. (Ex. 63 at 155:5-156:2, Ex. 63 at 157:14-161:2, Ex. 58 at 16:4-13, Ex. 60 at 22:4-25, Ex. 60 at 23:1-10, Ex. 63 at 155:5-156:2, Ex. 60 at 13:9-15, Ex. 22, Ex. 4, Ex. 24, Ex. 16, Ex. 23, Ex. 48, Ex. 1 ,Ex. 46)**

30.     In connection with her application for the Lead GMT position, Plaintiff took the BMAR test in February 2021, and she was never required to take it again.  (Ex. 2 at 162:25- 163:2.)

**UNDISPUTED BUT INCOMPLETE.**

**Lampe does not dispute that she took the BMAR test in February 2021 and passed it.  Lampe does not dispute that since February 2021, she has not been required to retake the test.   Lampe, however, had passed the Bennett technical aptitude tests prior to when the BMAR was implemented.  Even though she had taken and passed the Bennett test, she was made to take the BMARs.  Delta did not require male candidates, who had previously taken the Bennett test, to take the BMAR. (Ex. 63 at 157:14-161:2, Ex. 58 at 16:4-13, Ex. 23)**

31.     Lead GMT roles are virtually always awarded to GMTs and not GMMs because GMMs naturally have less familiarity with specialized equipment and are less likely to have diverse experience.  (Ex. 2 at 168:1-169:21.)  In fact, it is almost unheard of for a GMM to promote directly to a Lead GMT position for these reasons.  (Ex. 11 at 63:9-24; Ex. 8 at 22:9- 19.)

**DISPUTED.**

**The assertion that GMMs naturally have less familiarity with specialized equipment and a narrower range of experience is not supported by data.  Lampe's 12-year tenure as a GMM at Delta has provided her with specialized experience equal to and surpassing that of current GMTs. Lampe had all the qualifications of a Lead GMT and surpassed those of male applicants.  (Ex. 46, Ex. 22, Ex. 4)**

32.     Plaintiff was selected to interview for this Lead GMT position as she was ranked third among the candidates prior to her interview.  (Lead GMT Matrix, attached as Exhibit 19 to the Appendix; *see also* Ex. 8 at 6:2-23.)

**UNDISPUTED.**

33.     Plaintiff was not offered this Lead GMT role because Delta determined that she was not the most qualified candidate for the position.  (Ex. 2 at 174:16-25; Ex. 8 at 10:22-11:21, 16:9-17:3.)

**DISPUTED IN PART.**

**Lampe does not dispute Delta *said* it determined that she was not the most qualified candidate for the position.  Lampe does dispute the genuineness of that repeated and rehearsed legitimate non-discriminatory business reason given by Delta.  For example, that statement "determined she was not the most qualified" has been used**

**so frequently that Maier said Lampe did not get a position (for which she was never interviewed) because Delta "determined she was not the most qualified." Ex. 58 at 35:5-15.**

34.     Plaintiff had never been a GMT, was rated "[w]eak on specialized" equipment, and did not have any certifications at the time she interviewed for the Lead GMT position in March 2021.  (Ex. 2 at 175:9-14; *see also* Ex. 19.)  She also scored lower in the Leadership and automotive experience than at least two other candidates interviewing for the position.  (Ex. 2 at 175:1-8; *see also* Ex. 19.)

**DISPUTED IN PART.**

**Lampe does not dispute what is written on the matrix.  Lampe does dispute the matrix rankings were achieved through some genuine, uniform criteria.  For example, specialized equipment experience was not a minimum or preferred requirement of the Lead GMT position and neither Woodard nor Maier knew how much training Lampe had with specialized equipment and said there "is no way to quantify the experience." _Ex. 55_, _Ex. 58._ _82:17-83:3;_ _84:13-85:6_.**

35.     In contrast, the two candidates selected to fill open Lead GMT roles, Samuel Leyba and Kenneth Dickinson, had significantly more Leadership and relevant work experience. (Ex. 2 at 174:20-23; *see also* Ex. 8 at 10:22-11:21, 16:9-17:3; Ex. 19.)

**DISPUTED.**

**While the information management input into the Matrix elevated Leyba's and Dickinson's experience, in reality, Dickinson had much less leadership experience than Lampe. (Ex. 4, Ex. 31, Ex. 64)**

35.     Leyba, for example, who was already a GMT, had acted in a supervisor role every

day for eight months, was more senior to Plaintiff, had more mechanic experience than Plaintiff,

had various ASE certifications that Plaintiff did not have, and had more experience with

specialized equipment than Plaintiff.  (Ex. 2 at 177:19-178:19; *see also* Leyba Resume, attached

as Exhibit 20 to Appendix.)

> **UNDISPUTED.**

36.     Likewise, Dickinson had been a GMT at Delta since 2012, had been a full-time

MIC supervisor for almost one year, and had experience as a mechanic at multiple car

dealerships.  (Ex. 2 at 179:4-180:7; *see also* Ex. 8 at 10:22-11:4, 37:12-38:6.)

> **UNDISPUTED BUT INCOMPLETE.**
>
> **Lampe does not contest Dickinson's seniority date as 2012, which places him**
> **at a lower seniority than Lampe, who started in GSE in 2009.  Lampe had far**
> **more supervisory experience than Dickinson, working with teams in technical**
> **fields, which Delta simply ignored. (Ex. 49, Ex. 50, Ex. 4, Ex. 31.)**

37.     In July 2021, Plaintiff again applied for a Lead GMT position.  (Ex. 2 at 193:3-

13.)

> **UNDISPUTED.**

38.     Plaintiff, still a GMM, interviewed for the Lead GMT position in July 2021

with four other individuals - all of whom were GMTs.  (Ex. 2 at 194:5-13.)

> **UNDISPUTED.**

39.     Delta determined that Plaintiff was not the most qualified candidate for this

position.  (Ex. 2 at 194:19-22.)

> **DISPUTED IN PART.**

**Lampe does not dispute Delta *said* it determined that she was not the most qualified candidate for the position.  Lampe does dispute the genuineness of that repeated and rehearsed legitimate non-discriminatory business reason given by Delta.  For example, that statement "determined she was not the most qualified" has been used so frequently that Maier said Lampe did not get a position (for which she was never interviewed) because Delta "determined she was not the most qualified." (Ex. 22, Ex. 52, Ex. 51.)**

**Lampe does not dispute Delta *said* it determined that she was not the most qualified candidate for the position.  Lampe does dispute the genuineness of that repeated and rehearsed legitimate non-discriminatory business reason given by Delta.  For example, that statement "determined she was not the most qualified" has been used so frequently that Maier said Lampe did not get a position (for which she was never interviewed).**

**<ins>*Maier Depo. 35:10-15.*</ins>**

40.      Unlike Plaintiff, the candidate selected for that Lead GMT position, James Belcher, had been a GMT for five years prior to his application, previously had front-line supervisor experience as a MIC, and had several certifications.  (Ex. 2 at 195:11-196:10; *see also* Ex. 8 at 37:3-16; Belcher Resume, attached as Exhibit 21 to the Appendix.)

**<ins>DISPUTED IN PART.</ins>**

**Lampe does not contest that Belcher was a GMT.  Belcher was a GMT because he had previously been promoted over Lampe for the position in 2017 with having only 1-year GSE experience to Lampe's 8 years' GSE experience.**

**Lampe disputes that Belcher had been a GMT for 5 years. (Ex. 4, Ex. 8, Ex. 20, Ex. 22, Ex. 49, Ex. 50, Ex. 51, Ex. 52.)**

41.    In September 2021, Plaintiff applied for (and was selected for) a GMT position in Austin, Texas.  (Ex. 2 at 113:24-115:7.)  In November 2021, she moved from Salt Lake City to Austin for the position.  *(Id.* at 115:22-24.)

**UNDISPUTED.**

42.    Plaintiff was paid $46.72 per hour in the GMT position - or $18.45 per hour more than what she made as a GMM.  *(See* Declaration of Kelley Nabors, Delta Declaration, 7, attached as Exhibit 22 to the Appendix.)

**UNDISPUTED.**

43.    A few months later, in February 2022, Plaintiff applied for (and was selected for) a promotion to a salaried position as a Training and Safety Specialist in Atlanta, Georgia.  (Ex. 2 at 116:20-117:12; *see also* Ex. 22 at  8.)

**UNDISPUTED.**

44.    As a Training and Safety Specialist, Plaintiff works to help develop GSE department training programs for both motorized and stationary equipment.  (Ex. 2 at 118:4-20.)

**UNDISPUTED.**

45.    In her current role, Plaintiff makes over $110,000 per year, which is more than twice what she made as a GMM.  *(See* Ex. 22 at  9.)

**DISPUTED IN PART.**

**Lampe does not dispute that her current salary is $110,000 per year.  However, this is not "more than twice" what she made as a GMM.  Lampe made $28.27 per hour ($58,801 per year) which did not include overtime.**

46.    Plaintiff filed her first Charge of Discrimination with the EEOC against Delta in May of 2020 (the "First Charge") which was later the subject of a Motion to Dismiss in Plaintiffs

first Lawsuit against Delta.  *(See* Order of Dismissal, attached as Exhibit 23 to the Appendix; *see also* First Charge, attached as Exhibit 24 to the Appendix.)

**UNDISPUTED.**

47.     Plaintiff filed her second Charge of Discrimination with the EEOC against Delta on or about August 11, 2021 (the "Second Charge").  (Ex. 4.)

**UNDISPUTED.**

48.     Plaintiff received a Notice of Right to Sue ("NTRS") on the Second Charge, through her counsel, on or about September 18, 2021, which was acknowledged by counsel in an email to the EEOC.  (NTRS for Second Charge, attached as Exhibit 25 to the Appendix; *see also* Email correspondence between M. Anderson-West and P. Miner, dated November 19, 2021, through November 22, 2021, attached as Exhibit 26 to the Appendix.)

**DISPUTED.**

**Lampe's counsel received a NRTS dated September 18, 2021, as to Charge Number 540-2021-04347.  The NRTS date was clearly an error since the September Charge was filed just one day prior.  The EEOC corrected the error and reissued the NRTS for the September Charge, dated October 27, 2021.**

49.     Plaintiff alleges in the Second Charge that Delta subjected her to unlawful discrimination based on her sex as follows:

a.     Between August 15, 2020 and August 11, 2021, Plaintiff was denied the same opportunities to work with specialized equipment than her male counterparts.  (Ex. 4.)

b.     In October, November, and December 2020 Plaintiff was denied security badges at outstations that were are necessary to gain experience with specialized equipment. Plaintiff alleges her male counterparts were given security badges.  *(Id.)*

c.      In October 2020, Plaintiff applied for Department Manager GSE, a position for which she alleges she was fully qualified.  Plaintiff alleges that Delta chose a male employee that had been employed for one year with Delta compared to her 11 years with the Delta.  *(Id.)*

d.      In December 2020, Plaintiff applied for promotion to GSE Regional Contracts Manager.  Plaintiff alleges she exceeded the qualifications listed by Delta for the position. Plaintiff alleges Delta passed her over and gave the position to a less qualified male employee.  *(Id.)*

e.      Between November 2020 and March 2021, Plaintiff alleges Delta never chose her to monitor de-icing operations.  Instead, the opportunity to work on specialized equipment was always given to male employees.  *(Id.)*

f.      In March 2021, Plaintiff applied for promotion as Lead GMT.  Plaintiff was required to take a "qualifying test" that she had taken in the past and passed.  Plaintiff alleges the male applicants for the Lead GMT position were not required to take a qualifying test.  *(Id.)*

g.      In June 2021, Plaintiffs male counterparts were able to work overtime which Plaintiff was not offered.  *(Id.)*

h.      In July 2021, Plaintiff applied for another Lead GMT position and was interviewed for the position but the position was offered to a less qualified male.  *(Id.)*

1.      Between August 14, 2020 and August 10, 2021, Plaintiff's hourly wage was $28.27 per hour and her male counterparts earned $46.72 per hour. *(Id.)*

**UNDISPUTED.**

50.      On or about September 17, 2021, Plaintiff filed her third Charge of

Discrimination with the EEOC against Delta (the "Third Charge").  (Ex 5.)

**UNDISPUTED.**

51.      Upon receipt of the Third Charge, the EEOC emailed Plaintiffs counsel and

asked her about the status of Plaintiffs litigation given that the NTRS had been issued for the

Second Charge and "the clock is running to file suit for [the Second Charge]."  (Email

Correspondence from P. Miner to M. Anderson-West, dated September 21, 2021, attached as Exhibit 27 to the Appendix.)

**DISPUTED IN PART.**

**Lampe does not dispute an email exchange between Patricia Miner and her legal counsel.  Lampe disputes Delta's interpretation as to the context of the email communications and disputes Delta adding words that are not within the emails, which speak for themselves.**

52.     Plaintiff received a NTRS on the Third Charge, through her counsel, on or about October 27, 2021.  (NTRS for Third Charge, attached as Exhibit 28 to the Appendix; *see also* Ex. 26.)

**UNDISPUTED.**

53.     Plaintiff alleges in the Third Charge that Delta subjected her to unlawful discrimination "from August 11, 2021 [to] September 17, 2021" based on her sex as follows:

a.     Plaintiff was required to take the BMARS mechanical aptitude test when she applied for a promotion when the male candidates did not have to take the BMARS mechanical aptitude test. (Ex. 5 at 1.)

b.     Delta paid Plaintiff $18.45 per hour less as the Environmental and Safety Coordinator than it paid the male employee who held the same position prior to Plaintiff. *(Id.* at 2.)

c.     As Training Coordinator, Plaintiff was paid $28.27 per hour versus the male employees that held the same position who were paid $46.72 per hour.  *(Id.* at 2.)

**UNDISPUTED.**

## ARGUMENT

### A.   LAMPE'S CLAIMS ARE NOT TIME-BARRED

The EEOC issued two official NTRS letters dated October 27, 2021. One of the NRTS letters refers to Charge Number 540-2021-03611, which Lampe filed on August 11, 2021. The second NRTS letter refers to Charge Number 540-2021-04347, which Lampe filed on September 17, 2021.

Lampe filed her complaint on January 11, 2021, with the Third District Court, State of Utah, Salt Lake City.  See ECF 1. Lampe's complaint was timely filed within ninety days of receiving the NRTSs.  *See* 42. U.S.C. § 2000e- 5(f) (l).

### B.   LAMPE'S TITLE VII CLAIMS DO NOT FAIL AS A MATTER OF LAW

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2012).  *Drescher v. Clinton City*, 2017 U.S. Dist. LEXIS 34980, *9

Failure to promote claims under Title VII follow the burden-shifting framework established under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Thuc Tran v. Sonic Indus. Servs.*, 490 Fed. Appx. 115, 118 (10th Cir. 2012) (applying the *McDonnell Douglas* burden-shifting framework to a failure to promote claim under Title VII).

Under that framework, the plaintiff must carry the initial burden of establishing a prima facie case of prohibited discrimination. *McDonnell Douglas*, 411 U.S. at 802.  For a plaintiff to establish a prima facie case for failure to promote, the plaintiff must demonstrate "(1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled by someone outside the protected

class." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005).  *Drescher v. Clinton City*, 2017 U.S. Dist. LEXIS 34980, *11-12

### 1.    Lampe Establishes Prima Facie Discrimination

Lampe is a member of a protected class, she applied for and was qualified for positions, despite being qualified, she was rejected and after she was rejected, Delta filled the position with males, outside of her protected class.

Establishing the prima facia case "creates a presumption that the employer unlawfully discriminated against the employee." *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1223 (10th Cir. 2003) (internal quotation marks omitted) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).  *Lee-Fanning v. Chao*, 2019 U.S. Dist. LEXIS 3286, *6

### 2.  Delta's proffered reasons for not promoting Lampe are pretext.

To negate Lampe's prima facie case of discrimination, "the burden shift[s] to the employer to articulate 'some legitimate, nondiscriminatory reason' for the questioned action." *Nulf*, 656 F.2d at 558 (citing *McDonnell Douglas*, 411 U.S. at 802).

"Evidence of pretext may include, but is not limited to, the following: prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (*e.g.*, falsifying or manipulating hiring criteria); and the use of subjective criteria." *Simms*, 165 F.3d at 1328 (citing *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984), *cert. denied*, 469 U.S. 855, 105 S. Ct. 181, 83 L. Ed. 2d 115 (1984)).

Delta's best reason it gives for failing to promote Lampe is saying forms of "she was not the most qualified."  This statement is made over and again and even when Lampe had not even interviewed for a position.   The presence of subjective decision making creates a strong inference of discrimination. *Turner v. Public Serv. Co.*, 563 F.3d 1136, 1140

30

3.      **Lampe's Claims are Not Time-barred and do Not Fail as a Matter of Law.**

a.      <u>Lampe's Claims are Not Time-Barred</u>.

Lampe's allegations as to failure to hire are not time barred as to the GSE Department Manager position for which she applied on October 17, 2020.   Lampe's allegations as to failure to hire the GSE Regional Contracts Manager, for which she applied in late October 2020 are not time barred.   Lampe's allegations as to failure to hire for the Lead GMT position she applied for in February 2021 are not time barred.

As established in her complaint, all discrete acts of discrimination that occurred after October 15, 2020, are timely.

b.      <u>Delta's Hiring Decision for Each Position Were Not Legitimate and Nondiscriminatory</u>.

Delta's stated reasons for rejecting Lampe include blanket statements such as "she was not the most qualified" and "the interview process did not hire her."  As stated above, Delta was so accustomed to using that excuse that Maier said "it was determined that she was not the most qualified" for a position for which she did not even interview.

Those statements are pretext.  In the situations described in the statement of facts above, Lampe was the most qualified candidate for the position.  Woodard was hired as the GSE Manager even though his seniority should have excluded him from consideration.  Schulte was hired as the GSE Regional Contracts Manager even though he did not meet the minimum job qualifications.  Dickinson and Belcher were hired as LGMTs even though they did not have a BMAR on record and they did not meet other criteria for the position.

**CONCLUSION**

Lampe filed her complaint within 90 days of receiving her NRTS from the EEOC.  Lampe set forth a prima facie claim of sex discrimination.  Delta's proffered reasons for failing to promote Lampe are subjective and pretext.  Delta's decision makers hired male candidates that did not meet minimum requirements of some positions.  Delta's decision makers asked Lampe different questions than the male candidates.  Delta's decision makers artificially inflated male candidates' qualifications and diminished Lampe's qualifications.  For all the foregoing reasons, Lampe respectfully requests that the Court deny Delta's MSJ and award Lampe her costs expended in connection with defending Delta's MSJ.

Respectfully submitted this 15th day of May 2023.

    /s/ Michele Anderson-West    
Michele Anderson-West
ANDERSON-WEST LAW
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that on the 15th day of May 2023, I filed a true and correct copy of the foregoing through the Court's ECF, which caused service on the following:

Fredrick R. Thaler
rthaler@rqn.com

David B. Dibble
dd@rqn.com

Katherine E. Priest
kpriest@rqn.com

    /s/ Michele Anderson-West    

32