IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLAIR LAMPE,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>DELTA AIR LINES, INC.,<br><br>　　　　　　　　Defendant. | **ORDER AND MEMORANDUM DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-55-TC-DAO<br><br>Judge Tena Campbell<br>Magistrate Judge Daphne A. Oberg |

Before the court are cross motions for summary judgment filed by Plaintiff Blair Lampe (ECF No. 26) and Defendant Delta Air Lines, Inc. (Delta) (ECF No. 22). Ms. Lampe asserts two causes of action against Delta for 1) sex discrimination in violation of Title VII of the Civil Rights Act; and 2) unequal pay in violation of the Equal Pay Act. The court held a hearing on the motions on September 13, 2023. For the following reasons, the court denies Ms. Lampe's motion and grants Delta's motion.

**FACTUAL BACKGROUND**

Ms. Lampe has been a Delta employee since 2009, when Delta hired her to work as a Ground Maintenance Mechanic (GMM) in the Ground Service Equipment (GSE) department at JFK International Airport in New York. (Dep. Blair Lampe 24:14–21, Ex. 2 to Def.'s Mot. Summ. J., ECF No. 23-2; GMM Job Description, Ex. 7 to Def.'s Mot. Summ. J., ECF No. 23-7.) About a year into her job, Ms. Lampe requested a one-year leave of absence to volunteer with Doctors without Borders in India, where she worked on automotive repair. (Id. 30:13–25.)

1

Shortly after her return to New York, around 2012, Ms. Lampe became Ready Reserve at Delta, meaning that her annual hours were capped so that she worked on average around 20 hours per week.  (Id. 25:13–26:20.)  She also pursued various side jobs as a technical writer and as a theater technician.  (Id. 18:2–22:7, 27:8–18.)  In 2018, she transferred to Salt Lake City and once again began full-time work as a GMM.  (Id. 24:25–26:1.)  She also took on various additional roles, including as a Training Coordinator and as the Environmental and Safety Coordinator. (Id. 93:15–98:1; Decl. Blair Lampe ¶¶ 5, 8, ECF No. 26-1.)

A GMM "performs as a semi-skilled mechanic in maintenance of Ground Support Equipment" who "may also assist a Ground Maintenance Technician Lead or a Ground Maintenance Technician on equipment when needed."  (GMM Job Description, ECF No. 23-7.) Ms. Lampe maintains that her duties as a GMM included "inspection, testing, maintenance, repair, documentation, troubleshooting and diagnosis of GSE motorized equipment, as well as additional compliance, administrative, and coordinator responsibilities."  (Lampe Decl. ¶ 4.)

Besides GMMs, additional positions within Delta's GSE department include Ground Maintenance Technicians (GMTs) and Lead Ground Maintenance Technicians (Lead GMTs).[1] A GMT is an advanced mechanic who typically works on specialized equipment.  (See Lampe Dep. 89:19-22.)  A Lead GMT supervises the daily operations and workflow of GSE mechanics and maintenance on equipment and must have a thorough theoretical and working knowledge of motorized ground support equipment, as well as the ability to lead groups of GMTs and GMMs. (See Lead GMT Job Description, Ex. 9 to Def.'s Mot. Summ. J., ECF No. 23-9.)

As might be expected, GMTs are paid a higher hourly rate than GMMs, and Lead GMTs

---

[1] Other roles in the GSE department include department managers, regional contract managers, specialists, and analysts.

are paid a higher hourly base rate than GMTs.  (Delta Pay Scales, Ex. 10 to Def.'s Mot. Summ. J., ECF No. 23-10.)  Salaries increase with seniority according to a set schedule, and GMTs and Lead GMTs may earn hourly premiums based on skills and licenses.  (See id.)

By all accounts, there are far more male employees working in Delta's GSE department than female employees.  Ms. Lampe alleges that 630 of the 637 GSE positions that have mechanical or technical roles are filled by men.[2]  Delta maintains that the discrepancy is due to fewer female applicants but does not contest that "technician and mechanic positions at Delta Airlines are predominantly male positions."  (Dep. Mike Maier 14:7–8, Ex. 55 to Pl.'s Mot. Summ. J., ECF No. 27-3.)  It is similarly undisputed that Ms. Lampe worked for Delta for approximately 11 years (from June 2009 to September 2021, not including a one-year leave of absence) at an entry-level GMM position before receiving a promotion, although Delta points out that Mr. Lampe was on Ready Reserve status and her annual hours were capped from approximately 2012 to 2018.

From May 2020 to September 2021, Ms. Lampe filed three charges of discrimination with the Equal Employment Opportunity Commission (EEOC).  Her first charge, filed on May 14, 2020, alleged that she was discriminated against on the basis of sex because she was not promoted to various positions and made less than her male counterparts.  She later sued on this charge in this court, but the Honorable Ted Stewart dismissed the case for failure to exhaust administrative remedies and because the court found that claims based on acts occurring before July 19, 2019, were time-barred.  Lampe v. Delta Air Lines, Inc., No. 2:21-cv-176-TS, 2021 WL

---

[2] Ms. Lampe does not explain the basis for this statistic.  She attached a roster of Delta GSE employees, which appears to show that there are between 21 and 24 women in the department.  (See Delta GSE Employees, April 2023, Ex. 1 to Pl.'s Mot. Summ. J., ECF No. 27-1.)  Regardless, the evidence suggests that a small fraction of the positions in the GSE department were filled by women during the relevant time.

3909930, at *3 (D. Utah Aug. 31, 2021).

Ms. Lampe filed a second charge of discrimination on August 11, 2021, alleging that Delta discriminated against her on the basis of sex by denying her four promotions and generally failing to provide her opportunities to gain more specialized knowledge.  (Second Charge of Discrimination, Ex. 4 to Def.'s Mot. Summ. J., ECF No. 23-4.)  On September 17, 2021, Ms. Lampe filed a third charge of discrimination, alleging discrimination on the basis of sex because she was paid less than her male coworkers and was required to take an aptitude test that her male colleagues were not required to take.  (Third Charge of Discrimination, Ex. 5 to Def.'s Mot. Summ. J., ECF No. 23-5.)

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.  See Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"  Argo v. Blue Cross Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  But courts should disregard statements that could not be presented at trial in any admissible form.  See id.

Once the movant shows there is an absence of a genuine dispute of material fact, Celotex, 477 U.S. at 323, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

4

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)).

"The standard for cross-motions for summary judgments is the same as for individual motions for summary judgment." Cannon v. State Farm Mut. Auto. Ins. Co., No. 2:13-cv-186, 2013 WL 5563303, at *1 (D. Utah Oct. 7, 2013) (citation omitted). "[The court] must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." Boyz Sanitation Serv., Inc. v. City of Rawlins, 889 F.3d 1189, 1195 (10th Cir. 2018).

## ANALYSIS

### I. Timeliness

"Title VII of the Civil Rights Act of 1964 prohibits, among other things, unlawful employment discrimination on the basis of an individual's sex." EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000). Before filing a lawsuit for discrimination or retaliation under Title VII, a plaintiff must file a claim with the EEOC within 180 days of any alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1). A plaintiff who then receives a Notice of a Right to Sue (NRTS) letter from the EEOC must file a lawsuit within 90 days after receipt of the NRTS letter. 42 U.S.C. § 2000e–5(f)(1). The 90-day period is "in the nature of a statute of limitations." Keller v. Cereal Food Processors, 250 F. App'x 857,

860 (10th Cir. 2007) (citation omitted).

Ms. Lampe was therefore required to file her complaint within 90 days after receipt of the NRTS letter from the EEOC.  Ms. Lampe received three NRTS letters related to the charges of discrimination she filed with the EEOC.  Her first charge of discrimination is not at issue in this action.  She filed her second charge of discrimination, in case number 540-2021-03611 (the 03611 case), on August 11, 2021.  (See Second Charge of Discrimination, ECF No. 23-4.)  The EEOC issued its NRTS letter on this charge on September 18, 2021, and the letter is properly labeled with the correct case number.  (Second Charge NRTS, Ex. 25 to Def.'s Mot. Summ. J., ECF No. 23-25.)  Indeed, email correspondence between Patricia Miner at the EEOC and Ms. Lampe's counsel, Michele Anderson-West, indicates that on September 21, 2021, Ms. Miner reminded Ms. Anderson-West that the "clock is running to file suit" on the 03611 case.  (Email from Patrica Miner to Michele Anderson-West dated Sept. 21, 2021, Ex. 27 to Def.'s Mot. Summ. J., ECF No. 23-27.)

Ms. Lampe filed her third charge of discrimination, in case number 540-2021-04347 (the 04347 case), on September 20, 2021.  (Third Charge of Discrimination, ECF No. 23-5.)  When the EEOC issued its NRTS letter on this claim on October 27, 2021, the letter was incorrectly labeled as pertaining to the 03611 case—in other words, it appeared as though the EEOC had issued a second NRTS letter in the 03611 case.  (See Third Charge (Error) NRTS, Ex. 65 to Pl.'s Opp'n, ECF No. 44-45.)  Ms. Anderson-West noticed this error a few weeks later and sent Ms. Miner an email on November 19, 2021, that read:

> Good morning Pat.
>
> I have two charges of discrimination for Ms. Lampe.  One filed on or around August 11, 2021 (Case No. 540-2021-03611) and the other filed on September 18,

2021 (Case No. 540-2021-04247) [sic].[3]

I received <u>two</u> NRTSs for Case No. 540-2021-03611.  One dated September 18, 2021 and one dated October 27, 2021.

The second one, for October 27, 2021 should be for Case No. 540-2021-04247 [sic].  Will you please check this?

I am drafting a complaint that needs both NRTS documents and the deadline is approaching for the 09.18.21 case.

(Email from Michele Anderson-West to Patricia Miner dated Nov. 19, 2021, Ex. 26 to Def.'s

Mot. Summ. J., ECF No. 23-26.)

Ms. Miner responded the following Monday agreeing that "what happened is the Notice

of Right to Sue for this case that is dated 10/27/21 should have been issued in the 540-2021-

04247 [sic] case."  (Email from Patricia Miner to Michele Anderson-West dated Nov. 22, 2021,

Ex. 26 to Def.'s Mot. Summ. J., ECF No. 23-26.)

Based on this correspondence, there does not appear to be a genuine dispute about what

happened.[4]  The EEOC issued the NRTS letter for the second charge of discrimination on

September 18, 2021, and correctly labeled that letter as pertaining to the 03611 case.  The EEOC

then issued the NRTS letter for the third charge of discrimination on October 27, 2021, but

---

[3] Both Ms. Anderson-West and Ms. Miner incorrectly refer to the 04347 case as ending in the digits 04247.

[4] Ms. Lampe's briefing suggests that it was the earlier letter that contained the error:

Lampe's counsel received a NRTS dated September 18, 2021, <u>as to Charge Number 540-2021-04347</u>.  The NRTS date was clearly an error since the September [i.e., third] Charge was filed just one day prior.  <u>The EEOC corrected the error and reissued the NRTS for the September Charge</u>, dated October 27, 2021.

(ECF No. 44 at 26 (emphasis added).)  But there is no evidence that the September 18, 2021 letter was mislabeled.  Instead, it was the October 27, 2021 letter that was mislabeled.

incorrectly labeled that letter as also pertaining to the 03611 case—instead of correctly citing the 04347 case.  The EEOC corrected this error after communicating with counsel.

Ms. Lampe filed her complaint in this action on January 11, 2022—more than 90 days after the NRTS letter in the 03611 case, but less than 90 days after the (incorrectly labeled) NRTS letter in the 04347 case.  "Compliance with the filing requirements of Title VII is not a jurisdictional prerequisite, rather it is a condition precedent to suit that functions like a statute of limitations and is subject to waiver, estoppel, and equitable tolling."  Million v. Frank, 47 F.3d 385, 389 (10th Cir. 1995).  But Ms. Lampe has not argued that the deadline in the 03611 should be tolled or that it was otherwise waived.  "If the claimant fails to file suit within 90 days, the claims alleged in the EEOC charge are foreclosed, even if the 300-day period for filing charges with the EEOC has not elapsed."  Tadlow v. Marshall Cnty. HMA, LLC, 603 F. App'x 693, 700 (10th Cir. 2015).  Moreover, "[i]f the claimant fails to file suit within the ninety-day window, the lapsed claims are not revived by including them in a second EEOC charge and restarting the process."  Brown v. Unified Sch. Dist. 501, Topeka Pub. Schs., 465 F.3d 1184, 1186 (10th Cir. 2006).

Accordingly, Ms. Lampe's claims in the second charge of discrimination are time-barred, whereas her claims in the third charge of discrimination are timely.  The timely claims contained in Ms. Lampe's third charge of discrimination are: 1) unequal pay claims; and 2) claims based on Delta's insistence that Ms. Lampe take the BMARS mechanical aptitude test.  These claims are restricted to discrimination that allegedly occurred between "August 11, 2021 and September 17, 2021[.]"  (Third Charge of Discrimination, ECF No. 23-5.)  See also MacKenzie v. City & Cnty. of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005), abrogated on other grounds by Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1185 (10th Cir. 2018) ("A plaintiff's claim in federal court is

generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC.").

## II. Failure to Promote

Ms. Lampe's failure to promote claims are contained within her second charge of discrimination and are therefore time-barred. Nevertheless, the court has examined the merits of these claims because, although the court finds that there is no genuine dispute about the mix-up with the EEOC, it is true that the EEOC made a mistake when it sent the third NRTS letter and the court therefore wishes to assure itself that it would not be unjust to dismiss Ms. Lampe's claims solely on procedural grounds. Having carefully examined the record presented, the court finds that Ms. Lampe has not presented evidence showing that Delta failed to promote her due to sex discrimination. Accordingly, Ms. Lampe's claims would fail even if they were timely.

Ms. Lampe does not argue that there is direct evidence of discrimination. Where evidence of discrimination is circumstantial, a plaintiff alleging sex discrimination is subject to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To survive summary judgment, the plaintiff must establish a prima facie case of discrimination, a burden that is "not onerous." Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005) (citation omitted). To state a prima facie case of discrimination, the plaintiff must demonstrate by a preponderance of the evidence that 1) they belong to a protected class; 2) they applied for a position for which they were qualified; and 3) they were "rejected under circumstances which give rise to an inference of unlawful discrimination." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

If a plaintiff states a prima facie case, the burden shifts to the employer to provide a "legitimate non-discriminatory reason for the adverse employment action." Orr, 417 F.3d

at 1149.  If the employer makes this showing, a plaintiff may only avoid summary judgment if they show that sex was a "determinative factor in the … employment decision, or show the [employer's] explanation for its action was merely pretext."  <u>Horizon/CMS Healthcare</u>, 220 F.3d at 1191.

### 1.  First Attempted Promotion: Department Manager

In October 2020, Ms. Lampe applied to become the GSE Department Manager.  (<u>See</u> Lampe Application Department Manager, Ex. 13 to Def.'s Mot. Summ. J., ECF No. 23-13.)  The court is skeptical that Ms. Lampe has established a prima facie case of discrimination regarding her failure to obtain this promotion because it is unclear whether Ms. Lampe was qualified for the position.  The Department Manager supervised all GSE personnel in Salt Lake City, including GMM, GMT, and Lead GMT positions (<u>see</u> Department Manager Posting, Ex. 14 to Def.'s Mot. Summ. J., ECF No. 23-14), and even Ms. Lampe admitted that going from a GMM position to the manager of the entire department would be a "significant step[.]"  (Lampe Dep. 126:5–8.)  Ms. Lampe has not pointed to any examples where Delta promoted a GMM to the Department Manager position at a large airport.

But even if Ms. Lampe were qualified for the position, it is undisputed that Fred Woodard—whom Delta ultimately hired—was more qualified.  Mr. Woodard was previously Delta's GSE Department Manager at JFK airport in New York City, where he supervised a team of 85 GMMs, GMTs, and Lead GMTs, and had experience overseeing a large budget.  (<u>See</u> Resume Fred Woodward, Ex. 15 to Def.'s Mot. Summ. J., ECF No. 23-15.)  Ms. Lampe has admitted that she did not have that level of supervisory experience at the time.  (Lampe Dep. 131:1–9 (affirming that Ms. Lampe had never been a department manager, overseen a budget, or

supervised a team of 85 workers)).[5]

Based on Mr. Woodard's extensive experience, the court finds no pretext or other evidence of discrimination in Delta's determination that he was the most qualified candidate for the Department Manger position.

### 2. Second Attempted Promotion: Regional Contracts Manager

Around the same time, in October 2020, Ms. Lampe also applied to become the Regional Manager of GSE Contracts.  (Lampe Dep. 131:17–132:8.)  The court finds that Ms. Lampe has established a prima facie case of discrimination concerning Delta's failure to promote her to this position.  Delta's decision to interview her (see Email from Patrick Dorismund to Mike Maier dated Nov. 5, 2020, Ex. 44 to Pl.'s Mot. Summ. J., ECF No. 27-3) demonstrates that she was qualified for the job.  And because the burden on Ms. Lampe to establish a prima facie case is "not onerous," Orr, 417 F.3d at 1149, the court finds that the substantial discrepancy between female and male employees in the GSE department, as well as Ms. Lampe's long work record without any promotion (even considering that she worked on Ready Reserve status during a significant portion of her career), are sufficient factors to demonstrate that Ms. Lampe was "rejected under circumstances which give rise to an inference of unlawful discrimination." Burdine, 450 U.S. at 253.

But Ms. Lampe is unable to show that sex was a "determinative factor in the … employment decision, or show the [employer's] explanation for its action was merely pretext."

---

[5] Ms. Lampe claims that Mr. Woodard's "seniority at the time of his application should have disqualified him based on Delta's Internal Mobility Policy."  (ECF No. 26 at 6; see also Delta's Internal Mobility Policy, Ex. 13 to Pl.'s Mot. Summ. J., ECF No. 27-1.)  But Ms. Lampe does not elaborate on this argument and the court can find nothing in Delta's Internal Mobility Policy suggesting that Mr. Woodward was disqualified from the position in Salt Lake City.  Delta also objects to the use of Delta's Internal Mobility Policy as evidence on the grounds that it was not disclosed during discovery.  (Def.'s Opp'n at 12, ECF No. 33.)

Horizon/CMS Healthcare, 220 F.3d at 1191.  The posting for the Regional Manager position

stated the following preferred qualifications: 1) "Bachelor's Degree or 5 plus years of relevant

experience"; and 2) "Front-line supervisory experience and GSE experience is strongly

preferred[.]"  (Regional Manager Posting, Ex. 16 to Def.'s Mot. Summ. J., ECF No. 23-16.)  Ms.

Lampe has not refuted facts demonstrating that Eric Schulte—who was ultimately hired—had

multiple years of front-line supervisory experience through his previous position as an

Operations Service Manager at the Seattle airport.  (See Resume Eric Schulte, Ex. 17 to Def.'s

Mot. Summ. J., ECF No. 23-17; see also Lampe Dep. 145:17–21 (acknowledging that Mr.

Schulte had years of front-line experience).)  In contrast, Ms. Lampe's front-line supervisory

experience consisted primarily of working as the mechanic in charge (MIC)—a position that

fulfills the duties of a lead mechanic if no lead is on duty—for a few shifts.  (Lampe Dep. 136:2–

137:8; see also id. 136:19–20 (estimating that the number of shifts on which Ms. Lampe had

served as MIC was "[p]robably five or less").)  Ms. Lampe also admitted that she did not have

experience overseeing contract maintenance workers for Delta and had not been responsible for

Delta's department operating budgets.  (Id. 134:24–135:17.)  Mr. Schulte's resume includes a

core competency in "Budget Management" and states that in his previous position he "[f]ocused

on optimizing Delta's newest hub, both financially and operationally."  (Schulte Resume, ECF

No. 23-17.)  Before joining Delta, Mr. Schulte worked for several years overseeing regional

recruiting efforts for the United States Navy, "including operational management, budgets and

safety procedures."  (Id.)

It is true that Ms. Lampe was a comparable or stronger candidate than Mr. Schulte

concerning the other preferred qualifications.  She had a Bachelor's degree whereas Mr. Schulte

did not, although Mr. Schulte's resume appears to demonstrate that he had five or more years of

relevant experience.  (Id. (stating that Mr. Schulte was an Operation Services Manager from April 2013 to November 2019).)[6]  Ms. Lampe also points out that she had worked in the GSE department for over a decade and disputes whether Mr. Schulte had three to six years of previous GSE experience.  (See Regional Manager Matrix, Ex. 17 to Pl.'s Mot. Summ. J., ECF No. 27-1 (listing 3–6 years of previous GSE experience for Mr. Schulte and 11–15 years for Ms. Lampe).)  The court is not persuaded that Delta inflated Mr. Schulte's GSE experience.  Over the course of six years, Mr. Schulte established and was then the program manager for the "Deice" and "Super Tug Tow Team" at Seattle (Schulte Resume, ECF No. 23-17), a position which Ms. Lampe recognized involved GSE equipment.  (Lampe Dep. 144:24–145:3.)  Delta could therefore conclude that Mr. Schulte had sufficient GSE experience to meet the preferred qualifications.  And, indeed, taking his front-line supervisory experience into consideration, Delta could reasonably conclude that Mr. Schulte surpassed Ms. Lampe in terms of the preferred qualifications.  Ms. Lampe's assertion that Mr. "Schulte did not meet the minimum requirements of the job" (ECF No. 26 at 12) is both unexplained[7] and unsupported by the record.

Rather than point to specific qualifications that Mr. Schulte lacked, Ms. Lampe takes issue with the matrix that Delta managers created to determine which candidates would be interviewed for the position.  (Regional Manager Matrix, ECF No. 27-1.)  Based on the results of the matrix, Delta selected four candidates to interview (including Mr. Schulte and Ms. Lampe).

---

[6] (But see Regional Manager Matrix, Ex. 17 to Pl.'s Mot. Summ. J., ECF No. 27-1 (stating that Mr. Schulte had only three years of experience where his primary responsibilities were similar to the responsibilities of a Regional Manager).)  Of course, Delta could reasonably conclude that Mr. Schulte had over five years of relevant work experience even if his primary responsibilities were similar for only three years.

[7] The court assumes that Ms. Lampe is referring to the minimum requirement that a candidate possess "knowledge of Ground Support Equipment maintenance functions."  (See ECF No. 23-16 at 3.)  For the reasons discussed above, the court finds that Mr. Schulte's resume indicates that he did possess this knowledge.

(See Email from Mike Maier to Kelley Nabors dated Dec. 11, 2020, Ex. 16 to Pl.'s Mot. Summ.

J., ECF No. 27-1; Email from Mike Maier to Serhiy Firmanchuk dated Nov. 9, 2020, Ex. 18 to

Pl.'s Mot. Summ. J., ECF No. 27-1.)  These interviews were conducted by Mike Maier, the

General Manager over the GSE motorized department, Patrick Dorismund, and Kelly Nabors.

(See id.)

Ms. Lampe argues that her credentials were deflated and other candidates' credentials

were exaggerated on the matrix.  But the court does not find evidence that these adjustments

occurred.  Ms. Lampe was given the highest rank of "5" for her knowledge of GSE maintenance

functions and a similar rank of "5" for her years of experience with the GSE department.

(Regional Manager Matrix, ECF No. 27-1.)  In contrast, Mr. Schulte (who also ranked "5" for

knowledge of GSE maintenance functions) received a score of "3" for his GSE department

experience.  (Id.)  Mr. Schulte ranked higher than Ms. Lampe (scoring a "4" instead of a "3") for

his years of experience in a position with similar responsibilities.  (Id.)  These rankings reflect

the qualifications discussed above: Mr. Schulte did not have as much experience with the GSE

department as Mr. Lampe, but he had more front-line supervisory and related management and

budgetary experience.

Ms. Lampe also points to the information included in a box titled "Technical

Experience," which reads "EPA/safety coordinator" for Ms. Lampe and "program mgr deice &

super tug team, coordinate fuelling [sic] & deice procedures, mged movement of Navy vessels"

for Mr. Schulte.  Ms. Lampe argues that her "11 years' experience working for Delta … was

consolidated to just 'EPA/safety coordinator.'"  (Pl.'s Mot. Summ. J., ECF No. 26 at 11.)  But

those years of experience are reflected elsewhere in the matrix (see Regional Manager Matrix,

ECF No. 27-1 (reflecting that Ms. Lampe had 11–15 years of GSE experience)) and Ms. Lampe

has not explained what other technical experience should have been included in this box.  There is also no indication that Delta overlooked Ms. Lampe's technical skills gained through her experience as the Environmental and Safety Coordinator—indeed, gaining experience with specialized equipment was a goal of that position.  (See Dep. Fred Woodard 15:4–8, Ex. 8 to Def.'s Mot. Summ. J., ECF No. 23-8 ("[Ms. Lampe] volunteered and was accepted for a position of safety environmental, and part of that job was to be able to task herself and track her hours on specialized equipment so we could get her a broader spectrum of experience on specialized equipment.").)  Finally, Ms. Lampe notes that Mr. Schulte was given credit for front-line supervisory experience as a "GSE Liaison SLC" (Regional Manager Matrix, ECF No. 27-1), even though such a position did not exist.  But although "SLC" appears to be a typo for "SEA," Mr. Schulte did work as the program manager for the de-icing and tug tow teams, thereby serving as a liaison to the GSE department even if he did not have that specific title.

In any event, it is unclear whether any minor errors or judgment calls included in the matrix are relevant.  The matrix was merely used to select candidates to interview (see Email from Maier to Nabors dated Dec. 11, 2020)—and Ms. Lampe was selected.  All the candidates performed comparably on the interviews, receiving either a "3" or "4" on the categories of "technical fit" and "cultural fit."  (See Email from Mike Maier to Serhiy Firmanchuk dated Nov. 30, 2020, Ex. 18 to Pl.'s Mot. Summ. J., ECF No. 27-1; Email from Serhiy Firmanchuk to Mike Maier dated Nov. 13, 2020, Ex. 18 to Pl.'s Mot. Summ. J., ECF No. 27-1.)  The three candidates who were not promoted were all recommended as potential candidates for other Delta positions.  (See id.)  The record shows that Mr. Maier and Mr. Dorismund only followed up with two candidates: Mr. Schulte and Robert Coleman.  (See Email from Mike Maier to Serhiy Fimanchuk dated Nov. 16, 2020, Ex. 18 to Pl.'s Mot. Summ. J., ECF No. 27-1.)  Ultimately, they

selected Mr. Schulte.  (Email from Maier to Firmanchuk dated Nov. 30, 2020.)

The record is silent about why Mr. Schulte outperformed the other candidates.  Indeed, Ms. Lampe misconstrues the statements Mr. Maier made about these interviews.  According to Ms. Lampe (see ECF No. 26 at 12), Mr. Maier testified that Mr. Schulte ranked higher than Ms. Lampe in "cultural fit"—an inherently subjective category—because "he came across a lot better" in terms of his "ability to communicate[.]"  (Dep. Mike Maier 50:15–24, Ex. 55 to Pl.'s Mot. Summ. J., ECF No. 27-3.)  But Mr. Maier made this statement comparing Mr. Schulte to Mr. Coleman, not Ms. Lampe.  (See id. 50:17–18.)  The court has been unable to locate any information in the record relating to Ms. Lampe's performance in the interview.  It has similarly been unable to locate any evidence of pretext.  Delta's explanation that Mr. Schulte was the best candidate for the job is amply supported by the many years Mr. Schulte spent performing similar job responsibilities as the Operations Service Manager in Seattle.  He had budgetary and management experience that Ms. Lampe did not possess.  Although Ms. Lampe may have outshone him in some categories, the court cannot second-guess Delta's hiring decisions where there is no evidence that the proffered reason was pretextual and no other evidence of discrimination.

### 3.  Third Attempted Promotion: Lead GMT

In February 2021, Ms. Lampe applied for a Lead GMT position—a position that was eventually filled instead by Kenneth Dickinson.  (See Lampe Lead GMT Application, Ex. 18 to Def.'s Mot. Summ. J., ECF No. 23-18; Woodard Dep. 10:22–12:1.)  It is undisputed that Ms. Lampe possessed the required qualifications for the job and received an interview.  (See Lampe Dep. 150:21–155:4.)  For the reasons discussed above, the court therefore finds that Ms. Lampe has stated a prima facie case of discrimination.

But again, the court finds no evidence of pretext.  Delta argues that Mr. Dickinson was the most qualified person for the job and testimony from Mr. Woodard, who conducted the interviews, states that Mr. Dickinson had experience in specialized and nonspecialized equipment, was already a GMT, and had taken on MIC leadership responsibilities.  (Woodard Dep. 10:22–11:8; see also Lampe Dep. 179:4–19 (referring to Mr. Dickinson's resume, which stated that he had been a GMT since 2012 and a full-time MIC for a year).)  In contrast, Mr. Woodard testified that Ms. Lampe lacked the same level of specialized experience.  (Woodard Dep. 16:12–17:3 (stating that although he could not quantify Ms. Lampe's experience compared to Mr. Dickinson's, Mr. Woodard understood from Ms. Lampe herself that "she had very little [specialized] experience, she wanted more").)  Although Ms. Lampe argues that she did gain specialized experience during her years as a GMM (and by taking on additional responsibilities, such as the Environmental and Safety Coordinator role), Mr. Woodard's assessment that a GMT had more specialized training than a GMM is reasonable.  Indeed, both Mr. Woodard and Mr. Maier were unable to recall any instance when a GMM had been promoted to a Lead GMT position without first becoming a GMT.  (Id. 22:9–19; Maier Dep. 63:9–11.)  Even Ms. Lampe could only point to two examples where she believed a GMM had received this promotion, but she was unable to corroborate either example with specific details.  (See Lampe Dep. 169:14–172:5 (acknowledging that Lead GMT roles are "usually" filled by GMTs but stating that Ms. Lampe had heard of one GMM in New York and one GMM in Los Angeles receiving this promotion).)

Although Ms. Lampe was a GMM and not a GMT, she nevertheless argues that her credentials were minimized and other candidates' qualifications were exaggerated in the employment matrix that Delta used to select candidates for an interview.  Again, because the

matrix was only used to select interviewees (Woodard Dep. 5:7–9), and because Ms. Lampe <u>was</u> selected for an interview, it is not clear that any minor errors in the matrix are relevant. Nevertheless, the court considers three arguments that Ms. Lampe makes.

First, Ms. Lampe points out she was only given a 3 out of 5 for leadership skills, even though the matrix states that she has "strong leadership skills." (LGMT Matrix, Exs. 24 & 28 to Pl.'s Mot. Summ. J., ECF No. 27-2.) But this lower ranking, even given Ms. Lampe's leadership capabilities, may simply reflect that she had only served as the MIC for about five shifts. (Lampe Dep. 136:19–20.) In contrast, both Mr. Dickinson and another candidate, Samuel Leyba (who received scores of "5" for leadership) consistently filled the role of MIC. (LGMT Matrix, ECF No. 27-2; <u>see also</u> Email from Fred Woodard to Mike Maier dated Mar. 14, 2021, Ex. C to Def.'s Reply, ECF No. 33-3 ("[T]here are only two GMT's [i.e., Mr. Dickinson and Mr. Leyba] qualified and ready for the position who actually perform MIC duties currently.").) In any event, it is not clear that an additional two points in the leadership category would have greatly changed the matrix, as Ms. Lampe's overall score would have remained below the scores of both Mr. Dickinson and Mr. Leyba due to their rankings in other categories. (LGMT Matrix, ECF No. 27-2.)

Second, Ms. Lampe maintains that she should not have been rated "weak on specialized." (<u>Id.</u>) But as discussed above, and even though Ms. Lampe gained some specialized skills from her volunteer positions and throughout her career, it is reasonable that Delta ranked a GMM lower on specialized skills than a GMT.

Finally, Ms. Lampe claims that Mr. Dickinson's skills were artificially inflated. There were two versions of the employment matrix (<u>compare</u> Lead GMT Matrix V1, Ex. 24 to Pl.'s Mot. Summ. J., ECF No. 27-2, <u>with</u> Lead GMT Matrix V2, Ex. 28 to Pl.'s Mot. Summ. J., ECF

No. 27-2), and the second version reflects a higher score for Mr. Dickinson due to improved ratings in the electrical, hydraulic, and welding categories.  (Id.)  But the second matrix incorporated feedback from supervisors, rather than a "pure focus on resume."  (See Email from Mike Maier to Fred Woodard dated Mar. 14, 2021, Ex. C to Def.'s Reply, ECF No. 33-3.)  Given Mr. Dickinson's extensive experience as a GMT, the court finds no reason to question his supervisor's assessment that Mr. Dickinson had excellent skills in these categories.

Moreover, emails between Mr. Woodard and Mr. Maier demonstrate that Mr. Woodard did hope to promote Ms. Lampe.  In March 2021, Mr. Woodard spoke of a "plan to get her the training on specialized equipment she is asking for and in need of for the next step toward GMT[.]"  (Email from Fred Woodard to Mike Maier dated Mar. 15, 2021, Ex. 29 to Pl.'s Mot. Summ. J., ECF No. 27-2.)  And in June 2021 (when it appeared that another position for LGMT would be opening shortly), he wrote the following:

> I am still looking at Blair Lampe for LGMT.  Yes I know she is only a GMM, however, her background shows she has actually been in supervision and management roles before, has the best organization skills I have seen in a while, not afraid to reach out for information and is very good at it, does not seem to be intimidated by anyone, and so far very respected in what she has done and still doing with safety and environmental for the shop….  Part of her safety/environmental position was that she needed to join a GMT whenever possible to continue her specialized training, which she has on several occasions, leaving the comfort and work of her office.
>
> Will she be tested?  I have no doubt the team will push back in some ways, but at the same time will be very couscous [sic] when it comes to confronting her.  She has tremendous drive and a great interest in seeing SLC GSE both shop and its team members succeed.  She is easy to talk to, thinks before she speaks, at least as far as I can see, is passionate about every task she is given to do it in the best possible manner and with quality, looks for alternative solutions to problems, she respects everyone for what they do, she is sharply dressed, arrives early to work, Blair Lampe is Delta.
>
> In my opinion Blair would make a better LGMT than some I have seen out there currently in the role.  Bottom line, when the position gets posted, and she applies for it again, and if she is the best candidate, will you let me promote her? …

(Email from Fred Woodard to Mike Maier dated June 1, 2021, Ex. 2 to Pl.'s Mot. Summ. J., ECF No. 27-1.)

Mr. Maier responded, "Thanks for the thoughtful comments…. Let me stew on this one." (Email from Mike Maier to Fred Woodard dated June 1, 2021, Ex. 2 to Pl.'s Mot. Summ. J., ECF No. 27-1.) The record is silent about Mr. Maier's further thoughts, but—as discussed below—Ms. Lampe was interviewed for another Lead GMT opening. Previously, Mr. Maier had expressed some hesitancy regarding Ms. Lampe's promotion from GMM to LGMT, but not in a way that suggested a gender bias. Instead, he related the following concern:

> The other thing we have been trying to do for several years is to get the ratio of GMT to GMM lower and get closer to a 1:1 mix based on the workload…. Thus drawing some GMT's up into Lead position gets SLC closer (approx. 16) [to] that desired mix and as further GMTs retire, transfer etc. opportunities will open for GMM. This may not sound great to many GMM's but the reality is the retirement program accelerated retirements for many and improved the timeline that this adjustment otherwise would have occurred in.

(Email from Mike Maier to Fred Woodard dated Mar. 14, 2021, Ex. 27 to Pl.'s Mot. Summ. J., ECF No. 27-2; see also Email from Mike Maier to Fred Woodard dated Mar. 15, 2021, Ex. C to Def.'s Mot. Summ. J., ECF No. 33-3 ("I see Blair continues to rank well but your comment alone that she is week [sic] on specialized shows a Leap from GMM to a Lead may be difficult and early in her progression.").) While emails from management demonstrate some reluctance to promote a GMM to a Lead GMT position, these emails contain no suggestion of sex discrimination. Rather, Mr. Woodard championed Ms. Lampe's talents even though he recognized that it would be a big step to promote her from GMM to Lead GMT.

The court therefore finds no pretext in Delta's assertion that Mr. Dickinson was the most qualified person for the Lead GMT position. Ms. Lampe has not come forward with other evidence of bias or discrimination.

### 4. Fourth Attempted Promotion: Lead GMT

Mr. Dickinson stepped down from the Lead GMT position after a few months and the position was relisted in July 2021, when Ms. Lampe again applied for the vacancy. (Woodard Dep. 36:23–24; Lampe Dep. 193:3–13.) And though Ms. Lampe again received an interview, James Belcher was selected over her for the position. (Lampe Dep. 193:24–194:25.)

Although understandably frustrating to lose out on a promotion for the same position a second time, there is again evidence in the record that Mr. Belcher was the most qualified candidate. His resume shows that he had been a GMT for five years[8] and had several certifications. (See Resume James Belcher, Ex. 21 to Def.'s Mot. Summ. J., ECF No. 23-21.) And Mr. Woodard testified that, compared to Ms. Lampe, Mr. Belcher "had more MIC duties, which are leadership roles daily out on the floor, controlling as a lead GMT would. He had better experience in his outside-of-Delta experience in equipment and vehicles." (Woodard Dep. 37:12–16.) Mr. Woodard conducted the interviews and his assessment that Ms. Lampe "again did very well, but scored just below James Belcher" (Email from Fred Woodard to Mike Maier dated July 27, 2021, Ex. 41 to Pl.'s Mot. Summ. J., ECF No. 27-3) is reliable given Mr. Woodard's lengthy email just weeks before explaining why Ms. Lampe would make an excellent Lead GMT. Indeed, recognizing that Ms. Lampe had now "been passed over for a LGMT position twice but come very close as second runner up[,]" Mr. Woodard asked Mr. Maier if the GMT vacancy created by Mr. Belcher's promotion to Lead GMT could be reserved for Ms. Lampe.[9] (Id.)

_____

[8] Ms. Lampe disputes that Mr. Belcher had been a GMT for five years (see Pl.'s Opp'n, ECF No. 44 at 24) but the court finds nothing in the record that casts doubt on the dates in Mr. Belcher's resume.

[9] Mr. Maier responded that the position could not be held for Ms. Lampe, as Delta would still need to follow its Standard Operating Procedure for open positions. (Email from Mike Maier to

Given Mr. Belcher's qualifications, the court finds no evidence that Delta's stated preference for hiring him constituted pretext or that there was other evidence of discrimination present in the hiring decision for this position.

## III.  Unequal Pay

In her third charge of discrimination, Ms. Lampe alleges that she was the Environmental and Safety Coordinator for Salt Lake City GSE and made $18.45 less than the male employee who held that position before her.  (Third Charge of Discrimination, ECF No. 23-5.)  She also alleges that as a Training Coordinator she made $28.27 per hour compared to male employees who had made $46.72 in that position.  (Id.)

But these allegations belie the nature of Delta's pay scale.  As Ms. Lampe concedes, the Training Coordinator and Environmental and Safety Coordinator roles are voluntary positions. (Lampe Dep. 93:25-99:9.)  Employees who fill these collateral assignments are paid their regular rate (for instance, a GMM is paid as a GMM; a GMT is paid as a GMT).  (Id. 97:23–98:1.)  The discrepancies that Ms. Lampe highlights are therefore not a fair comparison, because Ms. Lampe is comparing her pay as a GMM filling these roles to that of a GMT or Lead GMT.  Ms. Lampe has not provided evidence that a male GMM serving as either the Training Coordinator or the Environmental and Safety Coordinator was paid more than her.  Indeed, Ms. Lampe did not respond to Delta's arguments on this point in either her opposition memorandum or in the reply to her motion, so it appears that she has abandoned both her Title VII unequal pay and Equal Pay Act claims.  See Palzer v. CoxCom, LLC, 833 F. App'x 192, 199–200 (10th Cir. 2020) ("[A

---

Fred Woodard dated July 27, 2021, Ex. 41 to Pl.'s Mot. Summ. J., ECF No. 27-3.)  Shortly thereafter, in September 2021, Ms. Lampe was promoted to a GMT position in Austin.  (Lampe Dep. 113:24–115:7.)  A few months later, Ms. Lampe applied for and was selected for a salaried position as a Training and Safety Specialist in Atlanta.  (Id. 116:20–117:20.)

plaintiff] who fails to file a timely response waives the right to respond and to controvert the facts asserted in the motion.").

## IV.  Aptitude Test

In her third charge of discrimination, Ms. Lampe timely alleges that, before she was interviewed for the first Lead GMT position, she was required to take the Basic Mechanical Aptitude and Reasoning (BMAR or BMARS) test whereas other male employees were not. (Third Charge of Discrimination, ECF No. 23-5; see also Email from Fred Woodard to Mike Maier dated Mar. 16, 2021, Ex. 29 to Pl.'s Mot. Summ. J., ECF No. 27-2 ("Blair is taking the BMARS today since she has not done so in the past in this version, and since she is skipping the GMT role I am told she is required.").)  But Ms. Lampe is again making a false comparison, as she has not cited an example of a male GMM who was not required to take the test.  Mr. Woodard testified that "the only people required to take the BMAR before a promotion out of a GMM role are GMMs.  GMTs are not required to take the test."  (Woodard Dep. 7:9–11.)  He further explained the reason for the discrepancy: "Talent Acquisition has determined that GMTs are grandfathered back to the old system.  If they're currently in a GMT role, they are not required to take the BMAR test to move forward."  (Id. 7:13–16.)

Ms. Lampe did not rebut Delta's arguments on this point or otherwise present other evidence of any discriminatory practice concerning the administration of the mechanical aptitude test.  Accordingly, the court finds that it was not discriminatory for Delta to require Ms. Lampe to pass the BMAR test before interviewing her for a Lead GMT position.

## V.  Other Allegations of Discrimination

In her second charge of discrimination, Ms. Lampe makes a number of additional allegations, including that she was denied security badges at outstations, that she was not offered

overtime, and that she was not chosen to monitor de-icing operations. (See Second Charge of Discrimination, ECF No. 23-4.) These claims are time-barred and, in any event, Ms. Lampe has not provided any argument further pursing these claims. Accordingly, the court finds that Ms. Lampe has not brought forward facts supporting a Title VII claim based on any of the allegations in her second or third charges of discrimination.

## CONCLUSION

Both parties have presented good-faith arguments in this dispute. Gender parity in the workplace is a complex problem and continuing biases in high school and even earlier against women entering technical and mechanical fields may well have resulted in a lack of female candidates and a wide gender gap in Delta's GSE department. Although the extent of that discrepancy suggests that there may be more that Delta can do to promote gender equality in its mechanical and technical positions, the court has not found any evidence on this record of discriminatory hiring practices. There may have been opportunities to promote Ms. Lampe earlier in her career, but that time period is not part of the action that is currently before the court. Here, the court finds that Ms. Lampe lost out on promotions to candidates who were already GMTs, had operations experience, or were previously department managers. Ms. Lampe has not presented evidence showing that Delta's stated reason for preferring these other candidates—on the basis of their qualifications—was pretextual. And even if the court found there could be a reasonable dispute about this question, Ms. Lampe's failure to promote claims are time-barred.

Ms. Lampe should be commended for gaining employment and persevering in a field where she was one of very few women. But because the court finds no evidence on this record that Delta discriminated against Ms. Lampe on the basis of sex during the relevant time period,

the court grants Delta's motion for summary judgment and dismisses Ms. Lampe's claims.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.  The Plaintiff's Motion for Summary Judgment (ECF No. 26) is DENIED.

2.  The Defendant's Motion for Summary Judgment (ECF No. 22) is GRANTED.

3.  The Defendant's Motion to Exclude the Expert Testimony of Dr. Christy Glass (ECF No. 66) is TERMINATED AS MOOT.

DATED this 12th day of June, 2024.

BY THE COURT:

Tena Campbell
United States District Judge